**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TRI-REALTY COMPANY,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | |
| **URSINUS COLLEGE,** | : | **NO. 11-5885** |
| **Defendant.** | : | |

**MEMORANDUM OPINION**

Pratter, J.                                                        November 21, 2013

I.        PROCEDURAL BACKGROUND

Tri-Realty Company ("Tri-Realty") alleges that heating oil has leaked from underground tanks located on the campus of Ursinus College ("Ursinus") and migrated through the subsurface soil, contaminating the land and waters of the neighboring property owned by Tri-Realty, College Arms Apartments ("College Arms").  In its ten-count Amended Complaint [Doc. No. 4], Tri-Realty seeks damages in excess of $7 million under the Federal Water Pollution Control Act Amendments of 1972 (commonly known as the "Clean Water Act" or "CWA"), 33 U.S.C. § 1251, *et seq.*, the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701, *et seq.*, the Pennsylvania Clean Streams law, and various state common law causes of action, including negligence, private nuisance, public nuisance, and trespass.  Tri-Realty also seeks injunctive relief under the citizens suit provision of the federal Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B).

Ursinus has moved to dismiss the Amended Complaint on various grounds [Doc. No. 7].  First, Ursinus seeks dismissal of the CWA claim (Count III) because Tri-Realty has failed to allege that there was a discharge of oil directly into the navigable waters of the United States.  Ursinus argues that the OPA claim (Counts I and X) must be dismissed because (a) Tri-Realty

has not alleged a discharge of oil directly into the navigable waters of the United States; (b) Ursinus, as an end-user, is not a "facility" under the Act; and (c) the OPA claim is time barred. Ursinus seeks dismissal of the RCRA claim (Count II) because (a) Ursinus is an end-user of heating oil and does not fall within the provisions of the Act providing for citizen suits; (b) Ursinus is not a generator, transporter, or operator of a disposal facility; and (c) Tri-Realty has not alleged the "imminent and substantial endangerment" necessary to award injunctive relief under RCRA. Finally, Ursinus asserts that if the federal causes of action are dismissed, the remaining state law claims should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1).

While the motion to dismiss was pending, based on the discovery of what it called a second "seep" of oil from soil on Tri-Realty's College Arms property, Tri-Realty moved for a preliminary mandatory injunction that would require Ursinus to conduct comprehensive investigation and remediation of any oil contamination on Tri-Realty's property [Doc. No. 16]. After a three-day evidentiary hearing on the status of alleged oil contamination on the College Arms property, the motion for preliminary mandatory injunction was denied [Doc. No. 42].[1]

After considering the parties' briefing on the motion to dismiss, together with their oral argument on the motion, the Court will grant the motion in part, deny it in part, and hold part of it in abeyance. With respect to the RCRA claim, given the extent and nature of evidence presented by the parties at the hearing on the motion for preliminary injunction, the Court intends to convert the motion to dismiss that claim into a motion for summary judgment, and provide the

---

[1] Although for the sake of brevity the Court may refer in this Opinion to the facts set forth in its Findings of Fact & Conclusions of Law ("FOF/COL") denying the motion for preliminary injunction [Doc. No. 42], the Court does *not* rely on the evidence presented at the preliminary injunction hearing or in the parties' preliminary injunction briefing to reach the conclusions here regarding the motion to dismiss. The Court's resolution of the motion to dismiss is based exclusively on the Amended Complaint and the law regarding the statutes at issue.

parties with an opportunity to supplement their discovery and briefing on that claim for further

submissions to the Court.  Finally, the motion to dismiss the remaining state law claims will be

held in abeyance, pending the Court's resolution of the federal claims at summary judgment.

## II.    FACTUAL BACKGROUND

Because the Court writes primarily for the benefit of the parties, who are familiar with the

factual background of this action, and because the Court has discussed the facts leading up to this

litigation in extensive detail in its Findings of Fact regarding the motion for preliminary

injunction, the discussion in this Opinion is limited to those facts alleged in the Amended

Complaint that pertain to the Court's consideration of the motion to dismiss.[2]

Tri-Realty built and owns the College Arms Apartments, a residential apartment

complex managed by DiLucia Management.  College Arms is located in Collegeville,

Pennsylvania, adjacent to, down gradient, and due south of the campus of Ursinus College.  A

ravine known as "Bum Hollow" runs along the southernmost portion of the College Arms

property.  Waters commonly known as "Bum Hollow Run" run through this ravine and into the

Perkiomen Creek.[3]  Like the rest of the College Arms property, Bum Hollow Run is

downgradient to the Ursinus campus.  A stormwater pipe runs beneath the pavement of a parking

---

[2] The Court notes that the facts described here, which are based on the factual allegations in Tri-Realty's
Amended Complaint, may in some instances conflict with the facts set forth in the Court's preliminary
injunction Findings of Fact, which are based on further evidence developed through discovery.  For
example, Tri-Realty alleges throughout its Amended Complaint that oil spilled by Ursinus has entered
and contaminated Bum Hollow Run, and that representatives of ENVision have seen oil on the surface of
Bum Hollow Run.  Am. Compl. ¶¶ 16, 89, 109, 122.  Evidence presented at the preliminary injunction
hearing, however, revealed that repeated sampling of the waters of Bum Hollow Run has not indicated the
presence of oil or constituents of oil.  Ct.'s FOF/COL on Mot. Prelim. Inj. ¶ 68.

[3] The parties dispute whether the waters known as Bum Hollow Run are properly described as an
intermittent stream or a perpetual stream, because the level of the waters varies seasonally.  The parties do
not dispute that these waters eventually run into the Perkiomen Creek.  Ultimately, however, the
geological or hydrological status of Bum Hollow Run itself is not relevant to the Court's determination
here.  For the sake of simplicity, the Court will refer to the ravine as "Bum Hollow" and the waters
therein as a "stream" or "Bum Hollow Run".

lot at the College Arms property.  The southernmost end of the stormwater pipe sends

stormwater into a catch basin which ultimately discharges into Bum Hollow Run.

Ursinus College owns and operates a power plant and maintenance area on its campus.

In 1962, Ursinus installed two underground storage tanks, each with a capacity of 20,000

gallons, used to store heating oil for the Ursinus power plant.  The two tanks were installed

within 200 feet of the boundary between Ursinus and the College Arms property, and

approximately 500 feet from Bum Hollow Run.

In January 2003, Ursinus emptied one of the 20,000 gallon tanks ("Tank 1") and stopped

using it because Ursinus had reason to suspect that the integrity of the tank or the piping leading

to the tank was or likely was leaking.  Nevertheless, Ursinus did not conduct any testing on the

other tank ("Tank 2"), and continued to use that tank for its intended purpose.  In February 2004,

Ursinus hired B&F Petroleum Installations, Inc. ("B&F") to clean out Tank 1.  B&F reported to

the Pennsylvania Department of Environmental Protection ("PADEP") that there was a leak in

Tank 1.  Tri-Realty alleges upon information and belief that beginning in August 2004, Ursinus

knew or should have known that Tank 2 also had holes in it.

In June 2004, Center Point Tank Services, Inc. ("CPTS"), an environmental consultant

acting on behalf of Ursinus, excavated a pit in which Ursinus intended to install two new 20,000

gallon tanks to replace the old ones.  CPTS discovered rock and soil contaminated with heating

oil five to thirteen feet below ground, and fuel oil "emanating from the bedrock floor of the

excavation."  Am. Compl. ¶¶ 38-41.  Tri-Realty alleges that, from June 2004 until the present

day, CPTS has removed more than 33,000 gallons of oil-contaminated liquid from the Ursinus

campus.

Tri-Realty claims that at no time between 2004 and 2009 did Ursinus disclose to Tri-Realty that it had reason to believe that oil released from any tank on the Ursinus campus had migrated from the Ursinus campus onto the College Arms Property.[4]  Tri-Realty alleges that on November 3, 2004, Ursinus received a written report from CPTS that "[t]here is potential for off-property impact, based on the significant volume of [oil waste] observed in the shallow subsurface and the known downgrade topographic direction where [oil waste] can potentially migrate," or that the vapors from the spill could cause air-quality problems.  Am. Compl. ¶¶ 68-69.  Tri-Realty alleges that Ursinus never revealed this report to Tri-Realty, but Ursinus again sought permission to access College Arms.  Am. Compl. ¶¶ 62, 67-70.

On August 11, 2004, and again in September and October 2005, Ursinus asked Tri-Realty for access to the College Arms property.  Tri-Realty did not agree to give Ursinus access to its property, but instead sought to negotiate terms of a written access agreement to provide parameters for Ursinus's access, which would include Ursinus's payment of Tri-Realty's attorneys' fees.  The parties never finalized this agreement.  On two separate occasions in 2006 and 2007, Ursinus informed Tri-Realty that it was not then seeking access to the College Arms property but that it would alert Tri-Realty if it required such access.  Tri-Realty alleges, however, that consultants for Ursinus repeatedly entered the College Arms Property between 2006 and 2009 without the knowledge or consent of Tri-Realty to perform tests on water in Bum Hollow Run, which apparently did not reveal any contamination.  The results of these tests were not reported to Tri-Realty.

---

[4] Ursinus persuasively points out, however, that the allegation that Ursinus did not communicate the potential for contamination, or that Tri-Realty was oblivious to the potential for contamination, is implausible given that Ursinus made repeated requests for access to Tri-Realty's property, and the Amended Complaint itself makes clear that by August 2006 Tri-Realty and its counsel were in direct contact with PADEP over the access issues.  Am. Compl. ¶¶ 64-65, 72.

Tri-Realty claims that in the fall of 2009 an employee of DiLucia Management discovered a discharge of oil in the drainageway onto the northern hillside of Bum Hollow. Not long thereafter another employee reportedly smelled oil in the clubhouse on the College Arms property. In response, in January 2010, Tri-Realty sampled liquid from two locations on the College Arms property: (1) a sump in the basement of the clubhouse, and (2) the catch basin into which the stormwater pipe discharged. The results of these tests confirmed that the samples were contaminated with "gasoline range and diesel range organics." Am. Compl. ¶ 86.

On February 5, 2010, Ursinus allegedly informed Tri-Realty that an Ursinus consultant had observed oil in Bum Hollow Run and that Ursinus needed access to Tri-Realty's property. Marshall Geoscience Inc. ("MGI"), the environmental consulting firm hired by Ursinus in 2007 to replace CPTS, reported to PADEP that samples taken by MGI from the College Arms property on January 16, 2010, contained "weathered No. 6 fuel oil." Am. Compl. ¶ 93. (The Amended Complaint does not specify from what part of the property those samples were collected.) In February 2010, Tri-Realty hired its own environmental consultant, ENVision, Inc., to investigate contamination at College Arms.

On March 4, 2012, Ursinus filed a Notice of Intent to Remediate ("NIR") with PADEP, pursuant to the Pennsylvania Land Recycling and Environmental Remediation Standards Act of 1995 (commonly known as "Act 2"), 35 P.S. § 6026.101, *et seq.*[5] In April 2010, Tri-Realty and Ursinus finally reached an access agreement under which Ursinus could investigate and remediate any oil spills on the College Arms property. Tri-Realty alleges that, since the time that agreement was reached, Tri-Realty's representatives have discovered a "seep" of oil emerging

---

[5] Act 2 is a voluntary cleanup program under the auspices of the PADEP that sets forth specific procedures which remediators follow to meet certain cleanup standards, and pursuant to which remediators may be authorized to obtain a limited release of liability under Pennsylvania law. *See* Pennsylvania Department of Environmental Protection, Land Recycling Program, *available at* http://www.portal.state.pa.us/portal/server.pt/community/ land_recycling_program/20541.

from the soil approximately 40 feet from Bum Hollow Run, and vapors within and contamination of the groundwater beneath the College Arms clubhouse building.  Tri-Realty also alleges that "[r]epresentatives of ENVision have since April 5, 2010, repeatedly observed oil or evidence of oil contamination on the surface of Bum Hollow Run."  Am. Compl. ¶ 109.

In October 2010, Ursinus installed an oil skimmer in the catch basin at the southernmost end of the stormwater pipe on the College Arms property.  Likewise, in May 2010, Ursinus built a "bermed" area and placed sorbent booms on the northern side of Bum Hollow, down-slope from the oil seep, to intercept and contain oily discharges.  The parties dispute the effectiveness of these measures.

Following a November 2010 inspection of the College Arms property by PADEP, on March 28, 2011, PADEP sent Tri-Realty a letter informing it that it had "significant contamination" on its property.  The PADEP noted, however, that the source of the contamination was uncertain in light of an oil spill that occurred on the College Arms Property in 1968.  Am. Compl. ¶¶ 127-29.  Tri-Realty concedes that, in February 1968, approximately 4,000 gallons of heating oil spilled from a failed 8,000-gallon underground storage tank installed at College Arms.  Am. Compl. ¶¶ 130-132.  That spilled oil reached the Perkiomen Creek, but was then "burned off" by local fire departments.  Tri-Realty claims, however, that sampling of the soil at College Arms between 1990 and 2009 did not indicate the presence of oil contamination from the 1968 spill.

Tri-Realty alleges that groundwater at College Arms "has been and remains visibly contaminated by oil or constituents of oil released from [tanks] now or formerly located at the Ursinus campus."  Am. Compl. ¶ 142.  In addition, "[s]oils within Bum Hollow are contaminated and visibly stained . . . by ongoing discharges of oil and groundwater contaminated with

constituents of oil as such discharges travel to and emerge from the Seep and . . . travel to, enter, and are conveyed by the Stormwater Pipe onto the Drainageway."  Am. Compl. ¶ 143.  Tri-Realty also alleges that the groundwater at College Arms is "hydrologically connected to Bum Hollow Run and to the Perkiomen Creek."  Am. Compl. ¶ 142.  Accordingly, Tri-Realty alleges that "Bum Hollow Run has been and continues to be polluted by discharges of oil and groundwater contaminated with constituents of oil as a result of spills of heating oil" by Ursinus. Am. Compl. ¶ 144.

### III.   LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint.  Although the Federal Rules of Civil Procedure require only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and quotations omitted), a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.* (citation omitted).

To survive a motion to dismiss, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ."  *Twombly*, 550 U.S. at 555 (citations omitted).  The question is not whether the claimant will ultimately prevail but whether the complaint is "sufficient to cross the federal court's threshold."  *Skinner v. Switzer*, 131 S.Ct. 1289, 1296 (2011) (citation omitted).  An assessment of the sufficiency of a complaint is thus "a context-dependent exercise" because "[s]ome claims require more factual explication than others

to state a plausible claim for relief." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010) (citations omitted).

In evaluating the sufficiency of a complaint, the Court adheres to certain well-recognized parameters. For one, the Court must consider only those facts alleged in the complaint and accept all of the allegations as true. *Twombly*, 550 U.S. at 555 (courts must assume that "all the allegations in the complaint are true (even if doubtful in fact)"); *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) ("[A] court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."). The Court also must accept as true all reasonable inferences that may be drawn from the allegations, and view those facts and inferences in the light most favorable to the non-moving party. *See Revell v. Port Auth. of N.Y. & N.J.*, 598 F.3d 128, 134 (3d Cir. 2010). The Court need not, however, accept as true "unsupported conclusions and unwarranted inferences," *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 184 (3d Cir. 2000) (citations and quotations omitted), or the plaintiff's "bald assertions" or "legal conclusions" unsupported by factual allegations. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (citations and quotations omitted).

## IV. DISCUSSION

### a. Tri-Realty's Clean Water Act and Oil Pollution Act Claims

The success of Tri-Realty's claims under both the Clean Water Act and the Oil Pollution Act depends on whether Tri-Realty has adequately alleged that Ursinus has discharged pollutants into waters that are regulated by these federal statutes.

The CWA prohibits the discharge of any pollutant by any person except in compliance with certain laws.  33 U.S.C. § 1311.  The "discharge of any pollutant" is defined as "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12). The term "navigable waters" means "the waters of the United States."  33 U.S.C. § 1362(7).  The "waters of the United States" have been defined broadly, to include not only those waters which are navigable-in-fact, but also:

> (1) All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;
> (2) All interstate waters, including interstate wetlands;
> (3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:
> (i) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or
> (ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or
> (iii) Which are used or could be used for industrial purpose by industries in interstate commerce;
> (4) All impoundments of waters otherwise defined as waters of the United States under the definition;
> (5) Tributaries of waters identified in paragraphs (a)(1) through (4) of this section;
> (6) The territorial seas; and
> (7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a)(1) through (6) of this definition.

33 C.F.R. § 328.3(a).

The OPA, on the other hand, imposes liability on "each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines . . . ."  33 U.S.C. § 2702.  As in the CWA, "navigable waters" are defined as "the waters of the United States, including the territorial sea." 33 U.S.C. § 2701(21); 15 C.F.R. § 990.30.  "The legislative history of the OPA and the

textually identical definitions of 'navigable waters' in the OPA and the CWA strongly indicate that Congress generally intended the term 'navigable waters' to have the same meaning in both the OPA and the CWA." *Rice v. Harken Exploration Co.*, 250 F.3d 264, 267 (5th Cir. 2001). Accordingly, this Court looks to existing case law interpreting both, or either, the CWA and the OPA to determine whether Tri-Realty has adequately alleged that Ursinus has discharged polluting oil into waters governed by these federal laws.

Tri-Realty alleges that the Perkiomen Creek and Bum Hollow Run are both "navigable waters" within the reach of the OPA and the CWA, that College Arms is an "adjoining shoreline" to the Perkiomen Creek and Bum Hollow Run, that Bum Hollow Run has been and continues to be polluted by discharges of oil and groundwater contaminated with constituents of oil as a result of spills of heating oil on the Ursinus campus, and that there are continuing direct "discharges" of oil and contaminated groundwater from the stormwater pipe, drainage way, and seep to both soil at College Arms and to Bum Hollow Run "directly."  Pl.'s Opp'n at 13.  In total, Tri-Realty argues (almost hyperbolically), the Amended Complaint "presents *all too abundant* evidence of direct discharges of oil Ursinus spilled into a body of surface water."  Pl.'s Opp'n at 14 (emphasis added).

The Court cannot agree with this characterization of the allegations.  Tri-Realty has very clearly alleged that oil leaked "into the subsurface" from underground storage tanks on the Ursinus campus, approximately 500 feet from the ravine known as Bum Hollow.  Am. Compl. ¶¶ 24-25.  Tri-Realty does not allege that Bum Hollow Run flows through the Ursinus campus, nor has Tri-Realty identified any other surface waters on the Ursinus Campus into which the heating oil was allegedly discharged.  Therefore, Tri-Realty can only plausibly allege a discharge of oil directly into the soil (that is, dry land) or—more speculatively, but nonetheless plausibly—into

groundwater that is in direct contact with the underground tanks.[6]  The fact that this oil may then have migrated through the soil and groundwater to emerge, some five or six years later, in visible "surface" waters on top of soil and, ultimately, to flow into the allegedly "navigable waters" of Bum Hollow Run, does not necessarily transform the original release of oil into a discharge of a pollutant into navigable waters for the purposes of federal regulation, unless the Court concludes that groundwaters *themselves* are navigable waters subject to CWA and OPA regulations, or (for the purposes of CWA, but *not* the OPA), that Tri-Realty has adequately alleged that pollutants have reached Bum Hollow Run or the Perkiomen Creek through an intermediate "point source".

### b.  Clean Water Act Claim

The Supreme Court has stated, in *dicta*, that "[t]he [CWA] does not forbid the addition of any pollutant *directly* to navigable waters from any point source, but rather the addition of any pollutant *to* navigable waters.  Thus, from the time of the CWA's enactment, lower courts have held that the discharge into intermittent channels [of water] of any pollutant *that naturally washes downstream* likely violates [the Act], even if the pollutants discharged from a point source do not emit directly into covered waters, but pass through conveyances in between." *Rapanos v. United States*, 547 U.S. 715, 743 (2006) (citations and quotation marks omitted) (emphasis in original).  The Court "has held that the Act 'makes plain that a point source need not be the original source of the pollutant; it need only convey the pollutant to 'navigable waters'.'"  *Id.* (quoting *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe*, 541 U.S. 95, 105 (2004)).

Tri-Realty alleges that "the Stormwater Pipe, the Drainageway, the Seep and the sloping area directly between the Seep and Bum Hollow Run in addition to the two . . . [tanks] are all 'point sources' within the meaning of [the CWA]."  Pl.'s Opp'n at 28.  Accordingly, Tri-Realty

---

[6] "'Ground water' means water below the land surface in the zone of saturation."  40 C.F.R. §257.3-4(c)(3).

argues, the alleged addition of oil via these "point sources" to the "navigable" waters of Bum

Hollow Run and the Perkiomen Creek is an impermissible discharge within the meaning of the

Act.

"The term 'point source' means any discernible, confined and discrete conveyance,

including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure,

container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft,

from which pollutants are or may be discharged.  This term does not include agricultural

stormwater discharges and return flows from irrigated agriculture."  33 U.S.C. § 1362(14).

In view of the circumstances of the spill as alleged here, the tanks are the only "point

source" from which the oil was discharged directly by Ursinus.  As to the other locations or

conveyances (manmade or natural) Tri-Realty describes as "point sources," Tri-Realty has

alleged that oil reached those "point sources" *through* contaminated soil or groundwater.

A discharge of pollutants into navigable waters occurring only through migration of

groundwater and uncontrolled soil runoff represents "nonpoint source" pollution.  *See Sierra*

*Club v. El Paso Gold Mines*, 421 F.3d 1133, 1141 n.4 (10th Cir. 2005) ("Groundwater seepage

that travels through fractured rock would be nonpoint source pollution, which is not subject to

NPDES permitting."); *Northwest Envtl. Def. Ctr. v. Brown*, 640 F.3d 1063, 1070 (9th Cir. 2011)

("Stormwater that is not collected or channeled and then discharged, but rather runs off and

dissipates in a natural and unimpeded manner, is not a discharge from a point source . . . .");

*Friends of Santa Fe Cnty. v. LAC Minerals, Inc.*, 892 F. Supp. 1333, 1359 (D.N.M. 1995)

(holding that seeps of shallow subsurface water emerging through the soil are non-point source

carriers of pollutants); *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 220-21 (2d Cir. 2009)

("In practical terms, nonpoint source pollution does not result from a discharge at a specific,

single location (such as a single pipe) but generally results from land runoff, precipitation, atmospheric deposition, or percolation.") (quoting EPA Office of Water, *Nonpoint Source Guidance* 3 (1987)); *PennEnvironment v. PPG Indus., Inc.*, No. 12-0342, 2013 WL 4045794, at *20 (W.D. Pa. Aug. 8, 2013) (collecting cases).  *But see Raritan Baykeeper, Inc. v. NL Indus., Inc.*, No. 09-4117, 2013 WL 103880, at *15 (D.N.J. Jan. 8, 2013) (holding that plaintiffs adequately alleged that groundwater itself was a point source); *see also* Mary Christina Wood, *Regulating Discharges into Groundwater: The Crucial Link in Pollution Control Under the Clean Water Act*, 12 Harv. Envtl. L. Rev. 569, 575-85, 620 (1988) (arguing that subsurface waters running in defined channels, such as underground streams, meet the definition of "point source," but acknowledging that "percolating" groundwater does not).

This Court disagrees that, given its natural physical attributes, groundwater could fairly be described as a "discernible, confined and discrete conveyance."  Accordingly, the Court concludes that the diffuse downgradient migration of pollutants on top of or through soil and groundwater alleged here is nonpoint source pollution outside the purview of the CWA.

However, when such runoff is collected or channeled by man, it constitutes point source pollution within the meaning of the statute.  *See, e.g., Sierra Club v. Abston Constr. Co., Inc.*, 620 F.2d 41, 45, 47 (5th Cir. 1980) (holding that surface runoff from rainfall collected and channeled by coal miners in connection with mining activities is point source pollution); *see also* 40 C.F.R. § 122.2.  Accepting as true Tri-Realty's allegations that pollutants have reached Bum Hollow Run and the navigable waters of Perkiomen Creek via stormwater runoff collected and channeled through the "Stormwater Pipe" and the "Drainageway," the Court must accept that Tri-Realty has adequately alleged the addition of a pollutant to "navigable waters" from a "point source" and can avoid dismissal of that claim at this juncture.

### c. Oil Pollution Act Claim

The OPA imposes liability on "each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, *into or upon* the navigable waters or adjoining shorelines . . . ."  33 U.S.C. § 2702 (emphasis added).  Here, as discussed above, Tri-Realty has plausibly alleged a direct discharge of oil into or upon the soil surrounding the underground storage tanks or the groundwater beneath the Ursinus campus. Courts are divided as to whether groundwater is appropriately regulated as "waters of the United States" under the CWA or the OPA.  *See, e.g., Rice v. Harken Exploration Co.*, 250 F.3d 264, 269, 270 (5th Cir. 2001) (holding that "the law in [the Fifth] Circuit is clear that ground waters are not protected waters under the CWA," and that "subsurface waters are not 'waters of the United States' under the OPA"); *Vill. of Oconomowoc Lake v. Dayton Hudson Corp.*, 24 F.3d 962, 963, 965 (7th Cir. 1994) (holding that contaminated groundwaters, "just because these may be hydrologically connected with surface waters," and even though they may eventually reach streams, lakes, and oceans, are not regulated under the CWA); *Umatilla Waterquality Prot. Ass'n v. Smith Frozen Foods, Inc.*, 962 F. Supp. 1312, 1320 (D. Ore. 1997) (holding that "discharges of pollutants into groundwater are not subject to the CWA even if that groundwater is hydrologically connected to surface water"); *Cooper Indus., Inc. v. Abbott Labs.*, No. 93-0193, 1995 WL 17079612, at *4 (W.D. Mich. May 5, 1995) ("allegations . . . that the pollution of ground water which in part circulated from a point source on defendant's property was hydrologically connected to the pollution of the Fawn River. . . . are insufficient to state a cause of action under the [CWA]"); *Kelly v. United States*, 618 F. Supp. 1103, 1107 (W.D. Mich. 1985) ("[T]he remainder of [*Exxon Corp. v. Train*, 554 F.2d 1310 (5th Cir. 1977)] and the unmistakably clear legislative history both demonstrate that Congress did not intend the [CWA]

to extend federal regulatory and enforcement authority over groundwater contamination."). *But see, e.g., Ass'n Concerned Over Res. & Nature, Inc. v. Tenn. Aluminum Processors, Inc.*, No. 10-0084, 2011 WL 1357690, at *17 (M.D. Tenn. Apr. 11, 2011) (electing to follow those courts holding that groundwater is subject to the CWA provided it has an impact on federal waters); *Idaho Rural Council v. Bosma*, 143 F. Supp. 2d 1169, 1180 (D. Idaho 2001) (finding that "the CWA extends federal jurisdiction over groundwater that is hydrologically connected to surface waters that are themselves waters of the United States"); *Mut. Life Ins. Co. v. Mobil Corp.*, No. 96-1781, 1998 WL 160820, at *3 (N.D.N.Y. 1998) (finding complaint alleged "a hydrological connection between the contaminated groundwater and navigable waters" sufficient to state a claim); *Williams Pipe Line Co. v. Bayer Corp.*, 964 F. Supp. 1300, 1319–20 (S.D. Iowa 1997) (holding that, because the CWA's goal is to protect the quality of surface waters, the Act regulates any pollutants that enter such waters either directly or through groundwater); *Friends of Santa Fe Cnty.*, 892 F. Supp. at 1358 (holding that the Act covers groundwater that is hydrologically connected to surface water); *Wash. Wilderness Coal. v. Hecla Mining Co.*, 870 F. Supp. 983, 990 (E.D. Wash. 1994) ("any pollutant which enters [surface] waters [of the United States], whether directly or through groundwater, is subject to regulation"); *Sierra Club v. Colo. Ref. Co.*, 838 F. Supp. 1428, 1434 (D. Colo. 1993) (concluding that "the [CWA's] preclusion of the discharge of any pollutant into navigable waters includes such discharge which reaches 'navigable waters' through groundwater").

After close review of the competing analyses, this Court finds the reasoning of the Court of Appeals for the Fifth Circuit in *Rice* persuasive, and holds that Congress did not intend either the CWA or the OPA to extend federal regulatory authority over groundwater, regardless of whether that groundwater is eventually or somehow "hydrologically connected" to navigable

surface waters.  The Court finds support for this holding in both the language and legislative

history of the CWA[7] and in the Supreme Court's ruling in *Rapanos v. United States*, 547 U.S.

715 (2006).

In *Rapanos*, the Supreme Court examined its earlier interpretations of the term

"navigable waters" in *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985), and

*Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531

U.S. 159 (2001) (*SWANCC*), to determine whether wetlands "adjacent" to traditional navigable

waters fall within the federal regulatory authority of the CWA.  The plurality holding in *Rapanos*

repeatedly admonishes the lower courts and the U.S. Army Corps of Engineers ("Corps") for

attempting to expand the definition of navigable waters to encompass virtually all water,

regardless of its actual navigability, location, or consistency of flow.  *Rapanos*, 547 U.S. at 733-

34 ("The restriction of 'the waters of the United States' to exclude channels containing merely

intermittent or ephemeral flow also accords with the commonsense understanding of the term.  In

applying the definition to 'ephemeral streams,' 'wet meadows,' storm sewers and culverts,

'directional sheet flow during storm events,' drain tiles, man-made drainage ditches, and dry

---

[7] Courts addressing this issue have noted that Congress refers to "navigable waters" and "ground waters" as separate concepts in various Subchapters of the CWA.  In Subchapter I, which deals with program development and the study of water pollution, Congress consistently refers to "navigable waters *and* ground waters."  *See, e.g.*, 33 U.S.C. § 1252(a); 33 U.S.C. § 1254(a)(5); 33 U.S.C. § 1256(e)(1) (emphasis added).  This sentence construction and use of the conjunctive bespeaks of two "things", concepts, or types.  Nothing about the legislation suggests that Congress was given to redundancy in this regard.  In contrast, in Subchapters III and IV (which address water quality and discharge permitting) Congress uses only the phrase "navigable waters."  *See, e.g.*, 33 U.S.C. § 1312(a); 33 U.S.C. § 1342(a)(4); 33 U.S.C. § 1362(12).  The legislative history of the CWA also supports the contention that Congress intended to exclude groundwater from CWA regulation.  *See, e.g.*, S. Rep. No. 92–414 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3739 ("Several bills pending before the Committee provided authority to establish Federally approved standards for groundwaters which permeate rock, soil, and other subsurface formations.  Because the jurisdiction regarding groundwaters is so complex and varied from State to State, the Committee did not adopt this recommendation.").  *See also Exxon Corp.*, 554 F.2d at 1325–1330; *Village of Oconomowoc Lake*, 24 F.3d at 965-66; *Umatilla*, 962 F. Supp. at 1318-19.  Additionally, the House reportedly rejected an amendment that "would have brought groundwater within the permitting and enforcement sections of the bill."  *Umatilla*, 962 F. Supp. at 1318–19 (citing 118 Cong. Rec. 10,667 (1972)).

arroyos in the middle of the desert, the Corps has stretched the term 'waters of the United States' beyond parody.  The plain language of the statute simply does not authorize this 'Land is Waters' approach to federal jurisdiction.").  The Supreme Court also reiterated that, in *Riverside Bayview*, it had stated that the phrase "waters of the United States" "referred primarily to 'rivers, streams, and other *hydrographic features more conventionally identifiable as 'waters''* than the wetlands adjacent to such features." *Id.* at 734 (quoting *Riverside Bayview*, 474 U.S. at 131) (emphasis in original). "Likewise, in both *Riverside Bayview* and *SWANCC*, [the Supreme Court] repeatedly described the 'navigable waters' covered by the Act as 'open water' and 'open waters.'" *Id.* at 735 (citations omitted).

Ultimately, the plurality opinion of the *Rapanos* Court held that the term "waters of the United States," as used in the CWA, "includes only those relatively permanent, standing or continuously flowing bodies of water forming geographic features that are described in ordinary parlance as streams, oceans, rivers, and lakes." *Id.* at 739 (punctuation omitted) (quoting Webster's New Int'l Dictionary 2882 (2d ed. 1954)).  "As for wetlands, the Justices in the [*Rapanos*] plurality concluded that they only fall within the scope of the CWA if they have 'a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands.'" *United States v. Donovan*, 661 F.3d 174, 179 (3d Cir. 2011) (quoting *Rapanos*, 547 U.S. at 739).  In *Rapanos*, Justice Kennedy concurred, but proposed a slightly broader test which would bring wetlands within the purview of the CWA if they possess a "significant nexus" with the waters of the United States, such that the wetlands "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other

covered waters more readily understood as 'navigable.'" *Rapanos*, 547 U.S. at 780 (Kennedy, J., concurring).[8]

In light of the reasoning in *Rapanos*, which does not endorse a broad interpretation of the term navigable waters, and sets forth tests that will exclude some wetlands from the scope of the CWA, this Court is satisfied that groundwater (which is even less fairly described as "open water" or a conventionally understood hydrographic or geographic "feature" than any wetland) does not fall within the meaning of the statute.

In *Rice*, the Fifth Circuit held that "[i]t would be an unwarranted expansion of the OPA to conclude that a discharge onto dry land, some of which eventually reaches groundwater and some of the latter of which still later may reach navigable waters, all by gradual, natural seepage, is the equivalent of a 'discharge' 'into or upon the navigable waters.'" *Rice*, 250 F.3d at 271.[9] This Court agrees and holds that Tri-Realty has failed to allege a discharge of oil into or upon navigable waters or adjoining shorelines.  Accordingly, the motion to dismiss will be granted as to Tri-Realty's OPA claim.

### d.  Tri-Realty's Resource Conservation and Recovery Act Claim

Ursinus has moved to dismiss Tri-Realty's claim for injunctive relief under the RCRA. Federal Rule of Civil Procedure 12(d) provides that, "[i]f, on a motion under Rule 12(b)(6) or

---

[8] In *Donovan*, the Court of Appeals for the Third Circuit examined the holdings in *Rapanos* and held that wetlands meeting either the plurality test or Justice Kennedy's test fall within the jurisdiction of the Corps under the CWA.  661 F.3d at 184.

[9] In *In re Needham*, 354 F.3d 340 (5th Cir. 2003), the Fifth Circuit stated that "[u]nder *Rice*, . . . the proper inquiry is whether . . . the site of the farthest traverse of the spill, is navigable-in-fact or adjacent to an open body of navigable water. . . . Either basis is sufficient to trigger the OPA."  354 F.3d at 346.  In *Needham*, however, oil reached a body of water adjacent to an open body of navigable water not through groundwater seepage or stormwater runoff.  Rather, defendants in *Needham* had pumped oil from a containment basin directly into an adjacent drainage ditch, from which it spilled into Bayou Cutoff, and then into Bayou Folse, which flowed directly into the Company Canal, a navigable-in-fact industrial waterway that eventually flows into the Gulf of Mexico.  The parties stipulated that oil had been discharged into Bayou Cutoff and Bayou Folse, and that residue from the spill was found in Bayou Folse.

12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). It is well-established that, prior to converting a motion to dismiss into a motion for summary judgment, a district court must provide adequate notice to the parties of the changed status of the motion, and a reasonable opportunity to present all material made pertinent to such a motion. *Hilfirty v. Shipman*, 91 F.3d 573, 578 (3d Cir. 1996) ("Certainly, the nonmoving party must have adequate notice and time to present to the district court material relevant to [its] claim in order to demonstrate that there is a genuine issue of material fact that renders summary disposition of the case inappropriate.").

Because the Court has already heard substantial evidence regarding the RCRA claim in connection with Tri-Realty's motion for a mandatory preliminary injunction, and because the Court concludes that for case management and overall fairness purposes it is appropriate to consider that evidence in deciding the claim here, the motion to dismiss will be converted to a motion for summary judgment as to the RCRA claim, to be considered in conjunction with motions for summary judgment on the CWA claims, and will be held in abeyance pending the parties' submission of additional evidence and/or supplemental briefing on these two claims. The procedure for doing so is addressed in the Order accompanying this Opinion.

### e. State Law Claims

The motion to dismiss the remaining state law claims will remain extant pending the Court's summary judgment decision on the RCRA and CWA claims.

## V.   CONCLUSION

For the reasons stated above, the Court will grant Ursinus's motion to dismiss the

Amended Complaint in part and dismiss Tri-Realty's claims under the OPA.  The motion will be

denied as to Tri-Realty's claim under the CWA, and the motion will be converted to a motion for

summary judgment on Tri-Realty's RCRA claim.  An Order in keeping with this memorandum

opinion follows.


**BY THE COURT:**


S/Gene E.K. Pratter
**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**