IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TRI-REALTY COMPANY,** | : | **CIVIL ACTION** |
| *Plaintiff*, | : | |
| | : | |
| **v.** | : | |
| | : | |
| **URSINUS COLLEGE,** | : | |
| *Defendant*. | : | **No. 11-5885** |
| | : | |

PRATTER, J.                                                                   AUGUST 24, 2015

## OPINION

Tri-Realty Company ("Tri-Realty") sued Ursinus College ("Ursinus"), alleging that the

continuing effects of No. 6 fuel oil discharged from underground storage tanks ("USTs") on

Ursinus's property violate the Resource Conservation Restoration Act ("RCRA"), 42 U.S.C.

§§ 6901-6992k, the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1387, and several state laws.

Ursinus moves for summary judgment on the RCRA and CWA claims. For the reasons explained

below, the Court will grant in part and deny in part Ursinus's Motions for Summary Judgment.

I.       FACTUAL BACKGROUND[1]

A.       The Parties and the Properties

Ursinus is a not-for-profit college. Its campus is located in Collegeville, Pennsylvania. To

the south of and downhill from Ursinus is the College Arms Apartments ("College Arms"), a

residential apartment complex occupied by approximately 350 people and consisting of seven

---

[1] The facts are undisputed unless expressly noted. Where there is a factual dispute, the
facts are viewed in the light most favorable to Tri-Realty so long as Tri-Realty has record
support for its position. The Court has omitted certain facts and/or factual disputes that are
immaterial to the resolution of the pending motions.

residential apartment buildings, a clubhouse (the "Clubhouse"), and an outdoor swimming pool.[2] College Arms is owned by Tri-Realty and managed by the DiLucia Management Corporation.

The southernmost section of College Arms consists of a ravine known as Bum Hollow, at the base of which is a stream known as Bum Hollow Run. The parties dispute the character of Bum Hollow Run. Ursinus claims that Bum Hollow Run is made up of "intermittent water flow" attributable to stormwater, (*see* Def.'s CWA Ex. 11 at 60:10-20), but Tri-Realty claims that Bum Hollow Run is a seasonal stream, (*see* Pl.'s Ex. 80 at 7). The parties also dispute "the nature and extent of" the connection[3] between Bum Hollow Run and the Perkiomen Creek, a navigable-in-fact body of water located approximately 160 feet east of College Arms and separated from College Arms by Pennsylvania Route 29 ("Route 29"). Ursinus claims that Bum Hollow Run disappears 200 feet before the Perkiomen Creek and that any water from Bum Hollow Run that reaches the Perkiomen Creek does so through the ground, (*see* Def.'s CWA Br. 38-39; Def.'s CWA Ex. 8 at 4-5), while Tri-Realty claims that Bum Hollow Run is directly connected to the Perkiomen Creek through a flow that travels underneath Route 29 and eventually emerges at two separate outfalls, (*see* Pl.'s Ex. 80 at 19-21). There is no evidence of a surface connection between Bum Hollow Run and Perkiomen Creek, nor is there evidence that any people swim or bathe in Bum Hollow Run, or ingest any of the water, plants, or animals in Bum Hollow.

---

[2] The property on which College Arms is located was once home to a chicken coop and a laundromat. Both were destroyed in 1968. Between 1968 and 1990, heating oil was stored at College Arms and there was at least one reported instance of an underground storage tank releasing oil into the environment. The parties dispute whether College Arms' prior uses or previous oil spill are responsible for some of the oil constituents detected at College Arms today.

[3] The parties agree that Bum Hollow Run is hydrologically connected to Perkiomen Creek. (*See* Def.'s CWA Reply Br. 7; Pl.'s CWA Br. Ex. 80 at 19-21). Indeed, there is no dispute that dye placed into the visible flow of Bum Hollow Run on College Arms west of Pennsylvania Route 29 ("Route 29") emerged on the east side of Route 29 at the point where Bum Hollow Run supposedly meets with Perkiomen Creek.

Stormwater on the westernmost part of College Arms is collected in storm inlets and directed to an underground stormwater pipe (the "Stormwater Pipe") situated beneath the pavement. The Stormwater Pipe empties into a catch basin (the "Catch Basin") at the top of the northern hillside of Bum Hollow, just west of the swimming pool and the Clubhouse. The Catch Basin empties into an underground outfall pipe (the "Hillside Pipe"), which then discharges on the northern side of Bum Hollow. Four erosional features feed stormwater into Bum Hollow Run, and the western-most erosional feature is a drainage swale (the "Drainage Swale") starting at the point of the discharge from the Hillside Pipe. The lower section of the Drainage Swale (the "Lower Drainage Swale") is approximately 50 feet long, and the parties characterize the water present in the Lower Drainage Swale differently. Ursinus claims that the Lower Drainage Swale does not ordinarily contain any measurable flow of naturally occurring water, and that it is not a geographic feature because it would not exist but for the man-made placement of the Hillside Pipe. (*See* Def.'s CWA Reply Br. 9; Def.'s CWA Ex. 12 at 32:7-34:7). But Tri-Realty's expert Dr. James A. Schmid, a biogeographer, opines that the Lower Drainage Swale "receives groundwater seepage for extended periods of time" and carries "more than ephemeral surface water" down to Bum Hollow Run. (*See* Pl.'s Ex. 80 at 6-7). Dr. Schmid reports that the Lower Drainage Swale "has eroded down into the water table" and is visibly wet on days when no stormwater is flowing. (*Id.* at 15, 20). In other words, Dr. Schmid claims that springs in the Lower Drainage Swale create a small, but continuous flow of water to Bum Hollow Run within an identifiable bank. (*Id.* at 15).

The parties also dispute whether wetlands exist in Bum Hollow on approximately .02 acres (859 square feet) of College Arms. (*See* Def.'s CWA Ex. 8 at 24). Based on a variety of factors, including visual observations of borings made in July 2013, the presence of "facultative"

tree species (i.e., species that can grow in both wetland and non-wetland habitats) in Bum

Hollow, the presence of the water table 13 inches below the surface, the presence of saturated

soil 12 inches below the surface, the detection of the water table less than 24 inches below the

surface in 3 of 50 soil borings, and the presence of a supposed surface water connection between

the alleged wetlands and the Drainage Swale, Dr. Schmid opined that the alleged wetlands exist

and are covered by the CWA. Ursinus's expert David B. Tompkins, a wetlands and stream

biologist affiliated with Ursinus consultant Kleinfelder, Inc., found that the alleged wetlands are

typically dry, have no surface water connection to the Lower Drainage Swale under typical

conditions, and do not contain hydric soils.[4]

> B.    Discovery of Release and Initial Remedial Measures

On February 5, 2004, after conducting an investigation in late 2003, Ursinus reported to

the Pennsylvania Department of Environmental Protection ("PADEP") a release of No. 6 fuel oil

from its USTs.[5] Ursinus hired Center Point Tank Services, Inc. ("Center Point") to delineate and

remediate the contamination. Center Point emptied, cleaned, and closed the Ursinus USTs in

place in 2004. The tanks, unused, remain in the ground today.

Between mid-2004 and late 2006, Ursinus had over 33,000 gallons of

"product/groundwater mixture" removed from the area surrounding the USTs. (Def.'s Ex. 7 at

4). Ursinus claims to have installed several monitoring wells during that period along the

---

[4] Tri-Realty petitioned the U.S. Army Corps of Engineers for a jurisdictional determination regarding the alleged wetlands, but the Corps declined to make a jurisdictional determination in light of "ongoing (and potential future) activities" at College Arms related to remediation. (See Def.'s Request to Take Judicial Notice of Agency Action, Jan. 5, 2015, ECF No. 80; Pl.'s Resp. to Request to Take Judicial Notice of Agency Action, Jan. 7, 2015, ECF No. 81).

[5] The parties dispute when Ursinus learned of the release. Ursinus claims that the release was *discovered* on February 5, 2004, (see Def.'s RCRA Ex. 2 at 5), but Tri-Realty claims that Ursinus knew or should have known of the release when it pumped water out of the USTs on December 1, 2003, (see Pl.'s Ex. 2 at BF_18).

property line separating Ursinus from College Arms, but Tri-Realty disputes that assertion. As part of the initial response to the release, Ursinus and Tri-Realty attempted to negotiate an agreement granting Ursinus access to College Arms for investigative and remedial purposes. Negotiations broke down, and Ursinus terminated negotiations in 2006. Tri-Realty claims that notwithstanding the absence of an access agreement, Ursinus's consultants trespassed on Tri-Realty's property between 2006 and 2010 to investigate the release of oil. In 2007, Ursinus hired Marshall Geosciences Inc. ("MGI"), an environmental consulting company, to replace Center Point. Gilbert Marshall, the principal of MGI, was its point person in connection with the contamination and remediation issues at College Arms.[6]

      C.     Discovery of Oil on Tri-Realty's Property and Initial Access Agreement

In January 2010, Tri-Realty representatives discovered accumulations of oil in a sump and electrical box located in the basement of the Clubhouse. The oil was noted to be thick, dark in color, and tar-like. Also in January 2010, Mr. Marshall observed a black, highly viscous, tar-like material on the southern portion of Tri-Realty's property in Bum Hollow. Later tests confirmed the material to be "a weathered No. 6 fuel oil" similar to that "collected from" the monitoring wells on the Ursinus campus. (Pl.'s Ex. 26 at 7).

On March 4, 2010, at the suggestion of the PADEP, Ursinus filed a Notice of Intent to Remediate (the "NIR") with the PADEP pursuant to the Pennsylvania Land Recycling and Environmental Remediation Standards Act of 1995, 35 P.S. § 6026.101 *et seq.*, commonly known as "Act 2." Act 2 is a voluntary cleanup program under the auspices of the PADEP that sets forth specific procedures for remediators to follow, and pursuant to which remediators may

---

[6] The parties dispute the relevance of Mr. Marshall's professional experience prior to consulting on the release from the Ursinus USTs. Ursinus claims Mr. Marshall is experienced in the field of remediating underground storage tank release sites, but Tri-Realty claims that Mr. Marshall's experience is limited because he lacks prior experience dealing with No. 6 fuel oil.

obtain a limited release of liability under Pennsylvania law. Ursinus, the PADEP, and Tri-Realty also discussed the possibility of an administrative order authorizing Ursinus to enter College Arms for the purposes of environmental investigation and remediation pursuant to Act 2. On April 5, 2010, Tri-Realty and Ursinus reached an access agreement under which Ursinus could investigate and remediate the oil expressing in Bum Hollow. Ursinus was permitted to access College Arms for only two years, and was required to notify Tri-Realty in advance of entering the property.

Also in April 2010, an accumulation of oil was observed on the western portion of the northern hillside of Bum Hollow approximately 45 feet from Bum Hollow Run. For purposes of this litigation, this accumulation is known as the "First Seep." MGI believes that the oil expressing at the First Seep originated on the Ursinus campus, migrated downhill through the subsurface, intercepted groundwater, followed along a pathway created by the Stormwater Pipe, and ultimately discharged at the foot of the northern hillside of Bum Hollow. Since the discovery of the First Seep, oil discharges on rocks have been noted at the Hillside Pipe, and MGI has observed weathered oil in the Clubhouse basement sump, the Clubhouse basement electrical box, and at the outfall of the Clubhouse basement sump.[7] Tri-Realty's residents have been made aware of the contamination in Bum Hollow through letters and numerous warning signs near the First Seep.

     D.      History of Remedial Measures and Subsequent Access Agreements

In early May 2010, MGI constructed an earthen basin (the "Impoundment") to contain the oil and oil-contaminated water expressing at the First Seep. The Impoundment is now covered with absorbent pads and surrounded by tubular sorbent booms and silt fencing, although

---

[7] The College Arms sump outfall is located on the northern hillside of Bum Hollow about 25 feet to the north of the outfall of the Hillside Pipe.

Tri-Realty disputes that such measures were installed as early as May 2010. The Impoundment is connected to a shallow, man-made channel (the "Spillway") that, in the event of an overflow, intentionally directs excess fluid from the southeast corner of the Impoundment into the Lower Drainage Swale. The Spillway is lined with absorbent pads and topped with tubular sorbent booms intended to capture contamination and ensure that only water discharges from the Spillway. Tri-Realty claims that the Spillway was constructed about six months after the Impoundment, and that oil and oil-contaminated water routinely spills over the edge of the Impoundment into the Spillway and then empties into the Lower Drainage Swale.

In 2010, MGI installed an electronic Abanaki Petroextractor oil skimmer (the "Skimmer") in the Catch Basin to intercept and remove oil that may enter from the Stormwater Pipe. Ursinus pays the electrical bill for operating the Skimmer. Despite the presence of the Skimmer, a video taken in September 2010 appears to show oil and/or oil-contaminated water entering the Stormwater Pipe and flowing untouched through the Catch Basin, past the Skimmer, and toward the Hillside Pipe.

In November 2010, in response to purported complaints of fuel odor, Tri-Realty installed a vapor mitigation system in the Clubhouse. Ursinus reimbursed Tri-Realty for the cost of the system's components, installation, and operation, but not for its design. There have been no reported detections of fuel odors in the Clubhouse since the installation of the vapor mitigation system. MGI also installed 40 shallow groundwater wells at College Arms and periodically vacuums liquids from them.

Apart from the installation of the vapor mitigation system, Tri-Realty has not performed any remedial actions, temporary or permanent, at the site at any time. However, Tri-Realty has demanded that Ursinus take various additional remedial actions at College Arms, such as

replacing certain monitoring wells, vacuuming the Catch Basin, installing sorbent booms in the Drainage Swale, and lining the Stormwater Pipe to prevent oil from entering into it.

From May 2010 to April 2012, MGI inspected Bum Hollow and the interim remedial measures on a bi-weekly basis. The tubular sorbent booms were replaced on an as-needed basis and, beginning sometime after March 2011, accumulated oil, oil-contaminated water, and sediment were removed periodically from the Impoundment using a vacuum truck. To date, there have been no reports that the oil has reached the Perkiomen Creek, has caused any harm to people, plants, or wildlife, or has adversely affected Tri-Realty's ability to lease units at College Arms.

On June 21, 2011, Ursinus proposed to Tri-Realty and the PADEP a remedial system designed to capture impacted groundwater from locations that had been previously investigated. The PADEP purported to have previously given a "verbal go-ahead to Ursinus" to execute the proposal, (Pl.'s Ex. 43), but Tri-Realty rejected the proposal, citing concerns that the system would disturb the College Arms parking lot and was premature due to perceived gaps in the data recovered from the remedial investigation. Additionally, Tri-Realty disputes that the PADEP was empowered to approve the proposal.

The access agreement between Tri-Realty and Ursinus expired on April 19, 2012, and Tri-Realty refused to renew it on the same terms. Tri-Realty denied MGI access to College Arms until a new agreement was reached, so except for a site visit by the PADEP and MGI in May 2012, no activity was performed in Bum Hollow from May 2012 to September 2012. Tri-Realty did not ask its hydrogeologist, Raymond Duchaine of ENVision Environmental, Inc. ("ENVision"), to perform any remedial actions during that period, and Mr. Duchaine recommended that Tri-Realty not touch the Impoundment. On October 2, 2012, the parties

agreed to a limited access agreement for the purpose of allowing MGI to operate and maintain the Impoundment and the Skimmer.

On November 16, 2012, after Hurricane Sandy struck College Arms at the end of October 2012, Mr. Marshall discovered oil approximately 20 to 25 feet downslope of the Impoundment, within 15 to 16 feet of Bum Hollow Run. This accumulation of oil is known as the "Second Seep." Mr. Marshall "mopped up" the Second Seep contamination with absorbent booms and pads and removed oil-contaminated fallen leaves. (Pl.'s Ex. 57 at 68:21-69:12). Mr. Marshall's actions were the extent of the efforts at College Arms at that time with regard to the Second Seep.

On January 10, 2013, Mr. Marshall observed additional accumulation of oil at the Second Seep, and MGI again "mopped up" the oil with absorbent pads. On January 15, 2013, Tri-Realty representative Albert Ambron, Mr. Duchaine, and another ENVision representative observed a standing puddle of water where Mr. Ambron had seen water five days earlier, and an accumulation of weathered oil. After they reported their observations to Ursinus's attorney, MGI undertook various remediation efforts to deal with the new accumulation of oil. Thus, on January 16, 2013, MGI mopped up the oil with sorbent booms and pads, dug a 6- to 8-inch trench around the Second Seep, and installed a silt fence in the trench. MGI has continued to monitor the conditions in Bum Hollow on a weekly basis.

From January 16, 2013 to the present, MGI has monitored the Impoundment and has continued its testing, maintenance, and remedial efforts. On May 17, 2013, the parties entered into a new access agreement whereby MGI was permitted to perform investigative and remedial action at the site in furtherance of its Act 2 remediation. The agreement was limited to two years

and required five-days advance notice prior to every site visit, except in case of emergency. Ursinus installed additional monitoring wells at College Arms in the summer of 2013.

        E.      History of Testing at Ursinus and College Arms

       From May 2010 to April 2012, MGI and ENVision performed a series of vapor studies and soil-gas studies in and adjacent to some of the buildings at College Arms. They found no detections of ambient fuel oil constituents in excess of Pennsylvania statewide health standards. Over that same period, water samples from the confluence of the Lower Drainage Swale and Bum Hollow Run (the "Confluence") and from two points downstream[8] were tested 16 times for petroleum constituents on the PADEP's "short list" of chemicals of concern.[9] Thirteen of the 16 tests found no oil constituents in excess of Pennsylvania statewide health standards. The three tests finding oil constituents in excess of statewide health standards, performed on April 29, 2010, August 3, 2010, and January 31, 2011, detected only chrysene[10] and only at the Confluence, as the two samples collected from downstream were reported to be "non-detect" for

---

    [8] No samples were collected upstream from the area near the First Seep.

    [9] To demonstrate "attainment under any of the Act 2 standards," a person volunteering to investigate and remediate a release of "petroleum products, uncontaminated by other sources" needs to test the environment for, and to report to the PADEP the detection of, only a subset of the total number of chemical compounds which may be within a given petroleum fuel oil. (*See* Pl.'s Ex. 126 at IV-94). In a table it calls the "short list" and included in its Technical Guidance Manual for Act, 2, the PADEP lists the specific chemical compounds within different petroleum products for which the PADEP requires analysis and reporting. (*See id.* at IV-95, IV-96). Despite the "hundreds and possibly more" compounds present in No. 6 fuel oil, (*see* Pl.'s Ex. 118 at 56:10-21, 59:2-24), to investigate a release of No. 6 fuel oil under Act 2, the PADEP requires analysis and reporting of only 5 specific compounds in water and 11 specific compounds in soil. (*See* Pl.'s Ex. 126 at IV-94, IV-95). The short list does not include certain oil constituents that may be carcinogenic. (*See* Pl.'s Ex. 118 at 60:1-61:5).

    [10] Chrysene is ubiquitous in the environment and is often a component of asphalt and a byproduct of numerous combustion processes. Although Ursinus claims that there are several known sources of chrysene at College Arms, Tri-Realty stresses that chrysene has been detected in liquid in the Spillway.

oil constituents, including chrysene.[11] The Pennsylvania statewide health standard for chrysene in groundwater is 1.9 parts per billion ("ppb"), and the standard for chrysene in surface water is .0038 ppb. The parties dispute which standard applies to the fluids at the Confluence, whether the standard for chrysene in surface water applies only to drinking water, (*compare* Def.'s RCRA Br. Statement of Facts ¶ 56, *with* Pl.'s RCRA Br. Counterstatement of Facts ¶ 56 (citing 25 Pa. Code § 250 app. A, tbl. 1)), and whether the standard for chrysene in groundwater is a health-based standard,[12] (*compare* Def.'s RCRA Ex. 41 at 4, *with* Pl.'s RCRA Br. Counterstatement of Facts ¶ 55 (citing 25 Pa. Code § 250 app. A, tbl. 1)). Regardless of which statewide health standards are relevant, there is no evidence in the record regarding the significance of any statewide health standards or the risks associated with contamination in excess of any statewide health standards.

---

[11] This is not to say that oil or supposed evidence of oil (such as alleged iron staining and biomasses) has never allegedly been observed in Bum Hollow Run. For example, in July 2014, Mr. Duchaine testified that in the spring of 2011, he saw oil—"a sheen with a couple of small droplets"—in Bum Hollow Run. (Def.'s RCRA Ex. 61 at 65:1-2). According to Mr. Duchaine, oil seeps periodically "through the front of the [I]mpoundment" into the Lower Drainage Swale and thereafter into Bum Hollow Run, so the oil in Bum Hollow Run could have come from the Impoundment, the "storm water conduit," or both. (Def.'s RCRA Ex. 61 at 64:6-11, 86:6-14). It is not clear from Mr. Duchaine's testimony whether the "storm water conduit" refers to the Stormwater Pipe or some other geographic feature in Bum Hollow.

On July 22, 2015, Tri-Realty filed a Motion to Supplement the Summary Judgment Record (Docket No. 90). Tri-Realty asked the Court to consider the results of tests performed on Bum Hollow Run from August 2014 to July 2015, and the opinions of Mr. Duchaine based on those results. Tri-Realty contends that the new evidence demonstrates that oil from the Ursinus USTs is routinely present in Bum Hollow Run. The Court will not permit Tri-Realty to continue to supplement the record at this late stage, especially when Ursinus has not had a full opportunity to test the new evidence or the new post-deadline expert opinions offered by Mr. Duchaine. But even if the Court were to grant Tri-Realty's Motion to Supplement the Summary Judgment Record, the new evidence would not change the Court's decision with respect to Ursinus's Motions for Summary Judgment.

[12] Although it is a curious proposition that statewide *health* standards are anything but health-based, with the pantheon of bureaucrat-ese, it is possible to imagine such a situation. *See infra* note 23.

Over that same period, additional testing for petroleum constituents listed on the PADEP "short list" was performed at 22 shallow-zone monitoring wells located on the Ursinus and College Arms properties. In six of the shallow-zone monitoring wells, tests found benzene and 1,2,4 trimethylbenzene at concentrations ranging from 0.5 to 5.2 times the Pennsylvania statewide health standards. (*See* Def.'s RCRA Ex. 44). Chrysene was detected in excess of Pennsylvania statewide health standards in 17 of the 22 shallow-zone wells. Additionally, from 2007 to 2013, tests performed on six deeper-zone monitoring wells detected only 1,2,4 trimethylbenzene in two wells and on three occasions, and never in excess of the relevant statewide health standard for groundwater.

In May 2013, ENVision hand augered five borings into the subsurface of Bum Hollow between the Impoundment and Bum Hollow Run. One of those borings found oil in the subsurface at a point "beyond the Second Seep and . . . markedly closer to Bum Hollow Run than previously known." (Pl.'s Ex. 60). In July 2013, ENVision installed stakes and markers between Bum Hollow Run and the Impoundment. ENVision advanced 139 borings into the subsurface in July and August 2013, and Mr. Marshall was present to witness those borings.[13] ENVision found evidence of oil contamination in 52 of the 139 borings advanced after the preliminary injunction hearing within Bum Hollow downslope of the Impoundment and north of Bum Hollow Run. In 19 of the 52 borings, oil itself was found below the surface; soil discolored with oil and oil odors were noted in the remaining 33 borings. Tri-Realty installed piezometers[14] in seven of the borings. The concentration of benzene in one well on the Ursinus campus nearly doubled from

---

[13] In its March 14, 2014 Remedial Investigation Report ("RIR"), a report required under Act 2, Ursinus objected to the way in which these borings were advanced. Tri-Realty responds that Ursinus never voiced any disagreement with the method until then.

[14] Piezometers are devices designed to measure water levels (i.e., the height to which a column of water rises against gravity and the rate of groundwater flow).

August 2013 to October 2013, while in another monitoring well, the concentration of benzene

doubled and that of 1,2,4-trimethylbenzene more than tripled.

On August 6, 2013 and September 5, 2013, ENVision sampled the discharge from the

Impoundment flowing through the Spillway and to the Drainage Swale. Ursinus responded by

having Mr. Marshall sample the discharge from the Spillway on August 20, 2013 and October

24, 2013, resulting in a total of four samples taking over that two-month period. Two of those

samples contained benzene at 1.3 ppb, and another sample contained benzene at 1.4 ppb. Ursinus

claims that the relevant Pennsylvania statewide health standard is 5 ppb, but Tri-Realty claims

that the relevant Pennsylvania statewide health standard is 1.2 ppb. Ursinus therefore claims that

testing revealed benzene at levels *below* the statewide health standard, but Tri-Realty claims that

testing detected benzene at levels *above* the statewide health standard. Similarly, two of the

samples contained chrysene at .54 and .757 ppb, respectively, while another sample contained

chrysene at 2.0 ppb. Again, the parties disagree about the relevant statewide health standard:

Ursinus claims that the statewide health standard for chrysene is 1.9 ppb, so only one test

detected chrysene at levels above the statewide health standard; Tri-Realty claims that the

Pennsylvania statewide health standard for chrysene in surface water is .0038 ppb, which means

that the chrysene levels detected in three of the four samples exceed the relevant statewide health

standard. Finally, ENVision detected phenanthrene in its samples at 1.93 and 2.88 ppb,

respectively, but Ursinus detected phenanthrene in only one of its samples and only at 0.64 ppb.

By all accounts, ENVision's phenanthrene detections exceed the relevant Pennsylvania statewide

health standard of either 1.0 microgram per liter (per Tri-Realty) or 1.1 ppb (per Ursinus), but

Ursinus's phenanthrene detection does not. Ursinus did not detect chrysene or phenanthrene in

its sample taken on August 20, 2013. According to Ursinus, this indicates safe levels of chrysene

and phenanthrene in the discharge from the Spillway; according to Tri-Realty, Ursinus's testing was invalid because the lowest concentration that the test could detect exceeded one or more statewide health standard.

    F. The PADEP's Involvement

  The PADEP is an agency of the Commonwealth of Pennsylvania charged with responsibility for administering Pennsylvania's environmental laws and regulations, including "responding to complaints from persons affected by releases from storage tanks, overseeing and tracking the status of responsible party-led cleanups, and taking and overseeing state-led corrective action." (*See* PADEP, Storage Tank Cleanup Program, *available at* http://www.portal.state.pa.us/portal/server.pt/community/ storage_tank_cleanup_program/20605). The PADEP has been kept advised of the situation at College Arms since 2004. Ursinus has provided periodic updates to the PADEP on or about the following dates: April 7, 2007; February 24, 2010; March 10, 2010; December 30, 2010; June 21, 2011; March 14, 2012; August 24, 2012; February 27, 2013. Thus far, the PADEP has only made written recommendations that Ursinus take remediation steps and otherwise comply with Act 2 requirements for pursuing voluntary cleanup.

  The parties dispute the role that the PADEP has played. Ursinus claims that the PADEP has been closely watching the remediation efforts at the site and has not recommended or required that Ursinus alter its existing interim remedial measures since they were installed in May 2010. According to Ursinus, the PADEP has afforded Tri-Realty the opportunity to participate in the Act 2 process, and Tri-Realty in fact did so. Tri-Realty commented on the March 14, 2012 Remedial Investigation Report ("RIR"), a report required under Act 2, which the PADEP ultimately rejected. After MGI did work aimed at curing the problems with the March

14, 2012 RIR, MGI met with Tri-Realty's expert geologist, Mr. Duchaine, and the PADEP to discuss additional remedial tasks needed to cure the deficiencies in the RIR and resolve Tri-Realty's concerns. As a result, the parties signed a plan of action. Ursinus attempted to perform the work the PADEP had requested, and submitted a revised RIR to PADEP and Tri-Realty on March 14, 2014.

Tri-Realty, on the other hand, claims that the PADEP encouraged Ursinus to trespass onto College Arms and has not been forthcoming about the remediation efforts in Bum Hollow. For example, Tri-Realty claims that the PADEP met with Ursinus in Bum Hollow in 2007—without Tri-Realty's permission—to discuss remediation efforts, but that certain facts about what was observed in Bum Hollow were never disclosed. Additionally, Tri-Realty claims that the PADEP recommended that Ursinus change some of its remedial measures (e.g., putting a felt liner in the Hillside Pipe to help capture oil emerging from underground into the Hillside Pipe) and that Ursinus has not followed those recommendations.

On June 10, 2014, PADEP issued a letter disapproving of the revised RIR. On July 7, 2014, MGI submitted a supplement to its revised RIR, purporting to address certain deficiencies in the revised RIR that the PADEP identified. Upon reviewing the supplement, the PADEP accepted the March 14, 2014 RIR by letter dated July 8, 2014. Tri-Realty disputes that the PADEP had the authority to reverse its decision on the revised RIR by letter.

On November 14, 2014, pursuant to Act 2, Ursinus submitted to the PADEP a cleanup plan detailing proposed actions for College Arms and their purported remedial effects. On February 20, 2015, citing several alleged deficiencies in Ursinus's cleanup plan that do not affect the resolution of the pending motions in this case, the PADEP disapproved of the cleanup plan. (*See* Pl.'s Request to Take Judicial Notice of Agency Action, Mar. 6, 2015, ECF No. 86; Def.'s

Resp. to Request to Take Judicial Notice of Agency Action, Mar. 16, 2015, ECF No. 87; Pl.'s

Reply in Further Support of Request, Mar. 19, 2015, ECF No. 89).

        G.      Tri-Realty's Experts and the ECI Report

        1.      Dr. Dalbey's May 26, 2014 Report

Tri-Realty retained Dr. Walden E. Dalbey as an expert toxicologist. He issued an expert

report dated May 26, 2014. Dr. Dalbey opined that benzene, chrysene, and phenanthrene are

considered to be toxic chemicals, but he did not offer any opinions regarding the dose of those

chemicals that would lead to adverse effects in humans, animals, or plants. Dr. Dalbey based his

opinions, in part, on analytical results obtained from tests performed on three samples: one from

a monitoring well on Ursinus's property, one from the Clubhouse electrical box, and one from

the Impoundment.

Dr. Dalbey opined that each of the three samples "can be considered mutagenic." (Def.'s

RCRA Ex. 78 at 3). Dr. Dalbey also opined that each of the three samples "qualitatively . . . raise

concerns of possible noncarcinogenic effects . . . if repeated dermal exposure occurs." (*Id.*). Dr.

Dalbey's "qualitative sense" for how many "repeated dermal exposures" would need to occur to

the components of the three samples analyzed to cause noncarcinogenic effects has not been

quantified. (Def.'s RCRA Ex. 79 at 132:6-17). Dr. Dalbey did not perform a quantitative risk

assessment, but opined that the levels of polycyclic aromatic hydrocarbons[15] in each of the three

samples analyzed were high enough to raise "concerns about possible noncarcinogenic effects on

multiple organs in the body as well as on unborn fetuses if repeated dermal exposure occurs."

(Pl.'s Ex. 96 at 3).

---

[15] Polycyclic aromatic hydrocarbons, also known as polynuclear aromatic hydrocarbons, "are a group of organic contaminants that form from the incomplete combustion of hydrocarbons, such as coal and gasoline." U.S. Geological Survey, Polynuclear Aromatic Hydrocarbons (PAHs)/Polycyclic Aromatic Hydrocarbons (PAHs), http://toxics.usgs.gov/definitions/pah.html.

2.      Mr. Duchaine's May 26, 2014 Report

Mr. Duchaine, an expert geologist hired by Tri-Realty, created an expert report dated May 26, 2014. In it, he opined that "Ursinus oil . . . is moving and will continue to move through the subsurface across the entire western portion of College Arms." (Def.'s RCRA Ex. 60 at 1). He opined that "Ursinus oil will reach and discharge into [Bum Hollow Run] . . . and, in the future, may also discharge to Bum Hollow in an area downslope of the Clubhouse." (*Id.*). Mr. Duchaine does not have an opinion regarding the rate at which the oil is moving or will move beneath the subsurface, and explains that such a calculation is not possible on the basis of the current information available. Mr. Duchaine concluded that Ursinus oil is "an imminent and substantial endangerment to the environment at College Arms . . . ." (Def.'s RCRA Ex. 60 at 2). Although Mr. Duchaine is not a toxicologist and offered no opinion regarding the likelihood or type of harm that humans, animals, or plants might suffer from exposure to No. 6 fuel oil at College Arms, (*see* Def.'s RCRA Ex. 61 at 91:1-95:24), he opined that Ursinus oil presents a substantial and imminent endangerment to the environment.

3.      Dr. Smith's May 26, 2014 Report

Dr. James S. Smith, an expert chemist hired by Tri-Realty, issued an expert report dated May 26, 2014. Dr. Smith reviewed the analytical results obtained by labs that ran tests on "product" samples collected from various locations across College Arms, including the maintenance shed septic system, the Hillside Pipe, the basement of the Clubhouse, the Impoundment, and the soil south of the Impoundment. Dr. Smith opined that, with the exception of the product found in the maintenance shed septic system, all of the product samples analyzed were No. 6 oil attributable to Ursinus. Dr. Smith opined that the analysis showed a product with a viscosity similar to fresh No. 6 fuel oil from a refinery. While Dr. Smith acknowledged and

premised some of his opinions on the fact that the natural environment will biodegrade and change the viscosity of oil constituents released to the environment, he testified that he "never, ever" issues opinions regarding the rate of biodegradation for any chemical due to the number of unknown factors affecting the rate of biodegradation. (*See* Def.'s RCRA Ex. 39 at 62:14-62:9). Dr. Smith did not perform a risk assessment of any kind or issue any opinions concerning any measure of risk exposure at College Arms, but concluded that oil and oil-contaminated water has moved and will continue to move beyond the Clubhouse. (*See* Pl.'s Ex. 97 at 1, 7; Pl.'s Ex. 98 at 7 & fig. 1).

### 4.      The ECI Report

In June 2012, for purposes of obtaining a loan, Environmental Consulting, Inc. ("ECI"), an environmental consulting firm hired by Tri-Realty, created a Phase I Environmental Site Assessment for College Arms. ECI visited the College Arms property in April 2012 and June 2012, but did not sample any soil or groundwater. ECI recognized that the oil at College Arms posed a risk to humans by way of direct contact, ingestion, and inhalation. (*See* Def.'s RCRA Ex. 33 at 9). However, ECI concluded that "there is no complete pathway to exposure either via direct contact to the groundwater contamination or via ingestion of the groundwater," and that the risk of harm from vapor intrusion "is low and is unlikely to occur" due to the age of the discharge, the mitigation systems that are in place, and the absence of data showing high concentrations of contamination in indoor air. (*Id.* at 29-30). Tri-Realty ultimately relied on ECI's report to refinance the College Arms property, although Mr. DiLucia personally guaranteed the lender against environmental liability that might exist.

H.    Ursinus's Expert

Ursinus retained James A. Schaefer as an expert geologist and Dr. Scott D. Dwyer as an expert toxicologist. They co-authored a report dated June 27, 2014. After reviewing MGI's March 14, 2014 RIR and portions of Tri-Realty's expert reports, Mr. Schaefer and Dr. Dwyer developed a conceptual site model outlining the general categories of sources, chemicals of concern, transport mechanisms, exposure media, exposure routes, and receptor groups. They analyzed potential exposures at the buildings at College Arms, the Clubhouse drain and sump pump system, the Impoundment, the Drainage Swale, the Hillside Pipe, Bum Hollow Run, the Detention Basin, and the Perkiomen Creek. They concluded that there is no imminent and substantial endangerment to health or the environment associated with the oily material released at College Arms because the magnitude and frequency of potential exposures to human or ecological receptors cannot present such an endangerment. In support of their conclusion, they noted that the release occurred in 2004 and that no actual adverse effects have been reported in the ensuing years. With respect to the endangerment to the environment, they concluded that no further ecological evaluation is required under the PADEP's guidance to rule out such an endangerment because the affected area totals less than 2 acres and the area of contaminated sediments is less than 1,000 square feet.

In discussing the risk posed by oil constituents, these experts noted that adverse effects depend on the concentration of each fuel oil constituent, the pattern of exposure, the duration of exposure, and the route of exposure, as well as the characteristics of the receptor. Without much explanation, they stated that No. 6 fuel oil demonstrates a low level of toxicity after acute duration exposures, and opined that single exposures or related exposures over a short period of time require high concentrations to cause an adverse health effect. They concluded that non-

cancerous effects are unlikely to occur in the receptor groups identified at College Arms based on the infrequent exposures to small amounts of oil that might occur.[16] Similarly, they opined that the development of chemically-induced cancer in humans usually depends on repeated exposure to a carcinogen over a long period of time (i.e., months to years). Thus, they opined that the development of cancer in the receptor groups at College Arms is highly unlikely. Finally, these two experts concluded that indoor air exposures are highly unlikely to occur because tests have revealed no problem with vapor intrusion other than at the Clubhouse, and the situation at the Clubhouse has been remediated by way of the installation of the vapor mitigation system.

I.   Procedural History

Tri-Realty filed this lawsuit almost four years ago, on September 16, 2011, and filed an Amended Complaint on December 1, 2011. After Ursinus moved to dismiss on January 13, 2012, but before the Court issued a ruling, Tri-Realty filed a Motion for Preliminary Injunction (Docket No. 16). The Court held a two-day preliminary injunction hearing in April 2013, and the Court denied the preliminary injunction on September 19, 2013. The Court then granted in part and denied in part Ursinus's Motion to Dismiss (Docket No. 7), converting Ursinus's motion into a Motion for Summary Judgment on Tri-Realty's RCRA claim. Ursinus filed its Motions for Summary Judgment on Tri-Realty's CWA claim (Docket No. 64) and RCRA claim (Docket No. 65) on August 25, 2014. The Court heard the parties' oral arguments on the motions for summary judgment.

---

[16] Although Mr. Schaefer and Dr. Dwyer wrote that they found no evidence of oil constituents above Pennsylvania statewide health standards in the Drainage Swale, Bum Hollow Run, or the Perkiomen Creek, the parties dispute which Pennsylvania statewide health standards apply and, by extension, whether any oil constituents have been detected in excess of those standards. *See supra* Part I.E.

## II.   LEGAL STANDARD

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson*, 477 U.S. at 248). Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

The movant bears the initial responsibility for informing the court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P.

56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### III. DISCUSSION

#### A. STANDING

Ursinus challenges Tri-Realty's standing to sue under both RCRA and the CWA, arguing that Tri-Realty has not suffered an "injury in fact" and, alternatively, that Tri-Realty has not proven an injury within either statute's "zone of interests." Article III limits the federal judicial power to the resolution of "Cases" and "Controversies." U.S. Const., art. III § 2. "One element of the case-or-controversy requirement" is that plaintiffs "must establish that they have standing to sue." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). Article III standing is a "threshold jurisdictional requirement" for any case in federal court. *Public Interest Research Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 117 (3d Cir. 1997). "The essence of the standing inquiry is whether the parties seeking to invoke the court's jurisdiction have [presented evidence of] 'such a personal stake in the outcome of the controversy as to assure the concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 72 (1978). "[A] plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006).

Article III standing requires three elements: "(1) an 'injury in fact'; (2) 'a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court'; and (3) a showing that it 'be likely, as opposed to

merely speculative, that the injury will be redressed by a favorable decision.'" *N.J. Physicians,*

*Inc. v. President of United States*, 653 F.3d 234, 238 (3d Cir. 2011) (quoting *Lujan v. Defenders*

*of Wildlife*, 504 U.S. 555, 560-61 (1992)). To prove an injury in fact at the summary judgment

stage, the plaintiff must make "a factual showing," *Lujan*, 504 U.S. at 565, of

> an injury that is both (1) 'concrete and particularized' and (2) 'actual or imminent, not
> conjectural or hypothetical.' Each of these definitional strands imposes unique
> constitutional requirements. An injury is 'concrete' if it is 'real,' or 'distinct and palpable,
> as opposed to merely abstract,' while an injury is sufficiently 'particularized' if it
> 'affect[s] the plaintiff in a personal and individual way.' The second requirement—
> 'actual or imminent, not conjectural or hypothetical'—makes plain that if a harm is not
> presently or 'actual[ly] occurring, the alleged future injury must be sufficiently
> 'imminent.' Imminence is 'somewhat elastic,' but requires, at the very least, that the
> plaintiffs 'demonstrate a realistic danger of sustaining a direct injury.' In other words,
> there must be a realistic chance—or a genuine probability—that a future injury will occur
> in order for that injury to be sufficiently imminent.

*N.J. Physicians, Inc.*, 653 F.3d. at 238 (citations omitted). In the context of environmental law,

evidence of pollution on one's land ordinarily satisfies the standing inquiry. *See Fishel v.*

*Westinghouse Elec. Corp.*, 617 F. Supp. 1531, 1540 (M.D. Pa. 1985); *see also Parker v. Scrap*

*Metal Processors, Inc.*, 386 F.3d 993, 1003 (11th Cir. 2004) (finding the injury-in-fact

requirement satisfied where plaintiff presented evidence that the soil on plaintiff's land was

contaminated, that the defendant's USTs were leaking, and that solid waste migrated from

defendant's USTs onto plaintiff's land).

### 1.     Injury in Fact

Ursinus argues that Tri-Realty lacks standing to bring its CWA and RCRA claims

because Tri-Realty has failed to allege and/or prove that it has suffered an injury in fact. (*See,*

*e.g.*, Def.'s RCRA Br. 64 ("Tri-Realty has not introduced any evidence whatsoever to show

damage to [College Arms], whether or not it is caused by the alleged hazardous waste."). For the

reasons that follow, the Court finds Tri-Realty has established standing for purposes of summary

judgment because (1) Tri-Realty's Modified Amended Complaint contains sufficient allegations that it has suffered an injury in fact, and (2) Tri-Realty has produced sufficient evidence that it has suffered an injury in fact.

With respect to the RCRA claim, the Modified Amended Complaint alleges that the No. 6 oil released from the Ursinus USTs has contaminated Tri-Realty's property. (*See* Mod. Am. Compl. ¶¶ 139-51). Tri-Realty further alleges that it "has incurred, and will continue to incur, expenses in order to investigate this contamination and work towards removing the contamination," and that it "has been damaged by the contamination of the College Arms Property." (*Id.* ¶ 154). These allegations are sufficient to establish an injury in fact. *See Duke Power Co.*, 438 U.S. at 73-74 (finding the "environmental and aesthetic consequences" of pollution adequate to satisfy the injury-in-fact requirement); *Consolidated Companies, Inc. v. Union Pacific R.R. Co.*, 499 F.3d 382, 385-86 (5th Cir. 2007) (finding the presence of contamination on plaintiff's property, along with costs incurred to monitor that pollution, constitute "actual, concrete, and particularized" injuries). In addition, Tri-Realty has presented evidence suggesting that College Arms has been contaminated by the No. 6 oil released from Ursinus's USTs. *See infra* Part I.D-E. The presence of unwanted pollution at College Arms is an injury in fact capable of supporting standing for a RCRA claim. *See Parker*, 386 F.3d at 1003-04 (concluding that the plaintiff introduced sufficient evidence to satisfy the injury-in-fact requirement because there was evidence that "the soil on her land was contaminated, that USTs were leaking, and that solid waste migrated onto [her] property . . . ." (citing *Covington v. Jefferson County*, 358 F.3d 626, 638 (9th Cir. 2004))); *Consolidated Companies, Inc.*, 499 F.3d at 385-86 (finding evidence of an injury in fact where the plaintiff "produced evidence that contaminants are present in the soil" on its property).

With respect to the CWA claim, the Modified Amended Complaint alleges that No. 6 oil released from the Ursinus USTs reached Bum Hollow Run and other navigable waters located on College Arms. (*See* Mod. Am. Compl. ¶¶ 185-98). This is sufficient to confer standing on Tri-Realty as the owner of the property on which the contaminated navigable waters are located. *See Parker*, 386 F.3d at 1003-04; *Patterson v. Barden & Robeson Corp.*, No.04-803, 2007 WL 542016, at *5 (W.D.N.Y. Feb. 16, 2007) (finding that evidence of contaminated water flowing on plaintiff's property satisfies the injury-in-fact requirement).[17] In addition, Tri-Realty has produced sufficient evidence to show that waters covered by the CWA have been contaminated by the No.6 oil released from the Ursinus USTs. *See infra* Part III.C.3. On this record, there is sufficient evidence of an injury in fact that Tri-Realty has standing to proceed.

### 2.      Zone of Interests

Next, Ursinus argues that Tri-Realty's claim should be dismissed because its alleged injuries are not within the "zone of interests" that either RCRA or the CWA were designed to protect. "In addition to the constitutional standing requirements, federal courts have developed prudential standing considerations 'that are part of judicial self-government.'" *Davis by Davis v. Phila. Housing Auth.*, 121 F.3d 92, 96 (3d Cir. 1997) (quoting *UPS Worldwide Forwarding, Inc. v. U.S. Postal Serv.*, 66 F.3d 621, 626 (3d Cir. 1995)). Among those considerations is whether or not "a litigant demonstrate[s] that her interests are arguably within the zone of interests intended

---

[17] Ursinus urges the Court to adopt the view of the dissent in *Parker*, which concluded that the plaintiffs in that case lacked standing to raise their CWA claim because they failed to plead or prove any injury resulting from the pollution of the jurisdictional waters on the *defendant's* property. *See* 386 F.3d at 1021. However, both the majority and the dissent in *Parker* agree that a plaintiff has standing under the CWA if it is the riparian owner of polluted jurisdictional waters. *See id.* at 1004 n.11, 1021. In this case, Tri-Realty has presented evidence that jurisdictional waters *on Tri-Realty's property* have been polluted by the No. 6 oil released from the Ursinus USTs. *See supra* Part I.D-E. Thus, Tri-Realty has presented evidence that it is a riparian owner of polluted jurisdictional waters, thereby showing "an injury to [its] property and, therefore, to [itself]." *Parker*, 386 F.3d at 1004  n.11.

to be protected by the statute, rule or constitutional provision on which the claim is based." *Wheeler v. Travelers Ins. Co.*, 22 F.3d 534, 538 (3d Cir. 1994). "[T]he breadth of the zone of interests test varie[s] according to the provisions of law at issue." *Davis by Davis*, 121 F.3d at 97 (citing *Bennett v. Plenert*, 520 U.S. 154, 174 (1997)). The zone of interests test is "not meant to be especially demanding." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 398 (1987).

Ursinus claims that Tri-Realty's claims are beyond the "zone of interests" of RCRA or the CWA because Tri-Realty's motivation for pursuing those claims are "purely economic" (i.e., to recover sizeable attorneys' fees). The Court disagrees. RCRA establishes a comprehensive regulatory framework for the handling and disposal of solid and hazardous waste, *see Meghrig v. KFC Western, Inc.*, 516 U.S. 479 (1996), and there can be no question that the owner of property threatened by contamination from a neighboring property is the intended beneficiary of RCRA. Similarly, the purpose of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), so there can be no question that the CWA is intended to benefit the owner of property on which flow waters that are allegedly jurisdictional and polluted. Tri-Realty's alleged motivation for bringing the lawsuit, even if true, does not change the fact that Tri-Realty has presented evidence that No. 6 oil that was released from the Ursinus USTs now exists on the College Arms Property.[18] The Court will not bar Tri-

---

[18] The cases cited by Ursinus are unpersuasive. In *North Shore Gas Co. v. EPA*, 930 F.2d 1239 (7th Cir. 1991), the court questioned whether the "zone of interests" analysis even applies to RCRA, where Congress provided that "any person" meeting RCRA's requirements—regardless of whether they are within the zone of interests or not—may bring suit. *See* 930 F.2d at 1243. In the end, the court concluded that injuries to *polluters* are *not* within the "zone of interests" of environmental laws, but injuries to *pollutees are* within the "zone of interests" of RCRA. *See id.* ("As [environmental] laws are intended for the protection of the environment, not for the protection of persons deemed responsible for the consequences of having polluted the environment, the pollutees have standing but the polluters do not."). Similarly, in *Sierra Club v. EPA*, 755 F.3d 968 (D.C. Cir. 2014), the court explained that the "zone of interests" inquiry is in fact a question of whether a plaintiff "falls within the class of plaintiffs whom Congress has authorized to sue," not a question of standing. *Lexmark Int'l, Inc. v. Static Control Components,*

Realty's claim simply because it wishes to recover fees and costs that it, wisely or otherwise, has incurred in connection with this lawsuit.

B.   TRI-REALTY'S RCRA CLAIM

"RCRA's primary purpose . . . is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.'" *Meghrig*, 516 U.S. at 483 (quoting 42 U.S.C. § 6902(b)). Section 6972(a)(1)(B) of Title 42 of the United States Code, the citizen-suit provision of RCRA, permits a person to bring suit

> against any person . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1)(B). To prevail on a claim under § 6972(a)(1)(B), a plaintiff must prove "(1) that the defendant is a person, including, but not limited to, one who was or is a generator or transporter of solid or hazardous waste or one who was or is an owner or operator of a solid or hazardous waste treatment, storage, or disposal facility; (2) that the defendant has contributed to or is contributing to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste; and (3) that the solid or hazardous waste may present an imminent and substantial endangerment to health or the environment." *Interfaith Community Organization v. Honeywell International, Inc.*, 399 F.3d 248, 258 (3d Cir. 2005) (quoting *Parker*, 386 F.3d at 1014-15).

Ursinus moves for summary judgment on Tri-Realty's RCRA claim on two grounds: (1) under the primary jurisdiction doctrine, the Court should refrain from deciding the RCRA claim;

---

*Inc.*, 134 S. Ct. 1377, 1386-88 (2014). As a property owner who has presented evidence of contamination on its property, Tri-Realty is certainly within the class of plaintiffs whom Congress has authorized to sue.

and (2) Tri-Realty "has not and cannot prove that there exists an imminent and substantial threat to health and the environment caused by Ursinus's release of no. 6 oil more than a decade ago." (Def.'s RCRA Br. 37).[19]

1.    Primary Jurisdiction Doctrine

Ursinus argues that the Court should decline to consider Tri-Realty's RCRA claim under the primary jurisdiction doctrine because the PADEP and, if necessary, the Pennsylvania Environmental Hearing Board, are the proper decisionmakers with whom Tri-Realty should lodge its objections to the ongoing remediation efforts at College Arms. (*See* Pl.'s RCRA Br. 67). The primary jurisdiction doctrine "applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." *Baykeeper v. NL Indus., Inc.*, 660 F.3d 686, 691 (3d Cir. 2011) (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. 59 (1956)). Because federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them," *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976), "[a]bstention . . . is the exception rather than the rule," *Riley v. Simmons*, 45 F.3d 764, 771 (3d Cir. 1995).

Although there is no fixed test for determining whether the primary jurisdiction doctrine applies, courts generally consider four factors when deciding whether to stay a proceeding pending agency action: "(1) Whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) Whether the question at issue is particularly within the agency's discretion;

---

[19] Tri-Realty correctly points out that Ursinus misstates the relevant legal standard under RCRA. *See infra* note 20.

(3) Whether there exists a substantial danger of inconsistent rulings; and (4) Whether a prior application to the agency has been made." *Baykeeper*, 660 F.3d at 691. Upon careful consideration of these four factors, the Court finds that the primary jurisdiction doctrine does not apply in this case.

First, RCRA claims are within the conventional experience of judges and do not involve technical or policy considerations with the PADEP's particular field of expertise. By adopting the citizen-suit provision of RCRA, Congress intended that federal courts would decide RCRA claims notwithstanding the limited involvement of state environmental authorities. *See Baykeeper*, 660 F.3d at 691 (concluding that Congress decided that federal courts are competent to decide RCRA cases "when it wrote the RCRA . . . to authorize citizen suits in federal courts"); *see also PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 619 (7th Cir. 1998) (concluding that abstention "would be an end run around RCRA" given that "Congress has *specified* the conditions under which the pendency of other proceedings bars suit under RCRA" (emphasis in original)). Although the PADEP "has expertise in environmental matters, federal courts are nonetheless competent to decide cases such as the one before us." *Baykeeper*, 660 F.3d at 691. Indeed, "listening to the testimony of expert witnesses, assessing their credibility, and determining whether the litigant has carried the devoir of persuasion" is "very much within the competency of a federal district court." *Maine People's Alliance & Natural Resources Defense Council v. Mallinckrodt, Inc.*, 471 F.3d 277, 294 (1st Cir. 2006); *see Interfaith Community Org. Inc. v. PPG Indus., Inc.*, 702 F. Supp. 2d 295, 311 (D.N.J. 2010). Because there is nothing special about Tri-Realty's RCRA claim that places it within the PADEP's "particular field of expertise" or outside the "conventional experience of judges," the first factor weighs against the application of primary jurisdiction.

Second, the issues involved in adjudicating Tri-Realty's RCRA claim are not particularly within the PADEP's discretion. "Although [the PADEP] generally has discretion over environmental matters," the PADEP is not charged with enforcing RCRA. *Baykeeper*, 660 F.3d at 691. Indeed, RCRA "authorized federal courts to address environmental issues." *Id.* at 691-92. The fact that the PADEP may have special discretion with respect to the enforcement of other environmental statutes does not mean that every environmental issue that arises in the Commonwealth is particularly within the PADEP's discretion. Thus, "[t]he questions before this Court arise under the language of the RCRA, a statute which the [PA]DEP has no discretion to interpret," *Interfaith*, 702 F. Supp. 2d at 311-12, and the second factor therefore weighs against the application of primary jurisdiction.

Third, there is minimal risk of inconsistent rulings. The PADEP's involvement is limited on account of the voluntary nature of remediation under Act 2, and the PADEP is not being called upon to determine whether the situation at College Arms may present an "imminent and substantial endangerment to health or the environment." Indeed, the PADEP is deciding a materially different question (and applying a materially different standard) in its evaluation of remediation efforts under Act 2. *See* 35 Pa. Cons. Stat. § 6026.501(a) ("Any person demonstrating compliance with the environmental remediation standards . . . shall be relieved of further liability for the remediation of the site . . . for any contamination identified in reports submitted to and approved by the [PADEP] to demonstrate compliance with these standards and shall not be subject to citizen suits or other contribution actions brought by responsible persons."); *see also* 35 Pa. Cons. Stat. § 6026.304(l) (detailing the reports that must be filed under Act 2 and the information that those reports must include); 25 Pa. Code § 250.408 (same). Moreover, to the extent that the Court might eventually impose additional burdens on Ursinus

above and beyond those that may be imposed by the PADEP, "a more stringent remediation standard . . . is not a reason to invoke the primary jurisdiction doctrine." *Baykeeper*, 660 F.3d at 692 (quoting *Interfaith*, 702 F. Supp. 2d at 312). Thus, the third factor weighs against the application of primary jurisdiction.

Only the fourth factor—whether application to the agency has already been made—favors the application of primary jurisdiction. Indeed, the fact that Tri-Realty has been actively participating in the remediation efforts under Act 2 before the PADEP suggests that this lawsuit is "little more than an indirect collateral attack on the [PADEP's] present regulatory course." *Friends of Santa Fe County v. LAC Minerals, Inc.*, 892 F. Supp. 1333, 1348 (D.N.M. 1995). However, Act 2 is sufficiently distinct from RCRA so that even application to the PADEP under Act 2 is not enough to justify abstention. For example, compliance with Act 2 requires analysis and reporting of only those oil constituents on the Pennsylvania short list, but there are "hundreds and possibly more" oil constituents present in No. 6 fuel oil and many of the constituents *not* on the short list may be dangerous enough to result in RCRA liability. (*See* Pl.'s Ex. 118 at 56:10-21, 59:2-24, 60:1-61:5; *see also supra* note 8). Therefore, the PADEP's involvement is sufficiently limited that even taking into account Tri-Realty's participation in the proceedings under Act 2, there is insufficient justification for abstention under the primary jurisdiction doctrine.

        2.      "May Present an Imminent and Substantial Endangerment to Health or the Environment"

The parties dispute whether the situation at College Arms "may present an imminent and substantial endangerment to health or the environment." With respect to that critical phrase from the RCRA statute, the Third Circuit Court of Appeals has explained that

[t]he operative word . . . [is] 'may . . . . [P]laintiffs need only demonstrate that the waste . . . 'may present' an imminent and substantial threat . . . . Similarly, the term 'endangerment' means a threatened or potential harm, and does not require proof of actual harm . . . . The endangerment must also be 'imminent' [meaning that it] threatens to occur immediately . . . . Because the operative word is 'may,' however, the plaintiffs must [only] show that there is a potential for an imminent threat of serious harm . . . [as] an endangerment is substantial if it is [serious] . . . to the environment or health.

*Interfaith*, 399 F.3d at 258 (quoting *Parker*, 386 F.3d at 1015 (internal quotations and citations omitted)). The RCRA standard thus builds in two layers of probability that may result in liability: anything that *may* present (but not necessarily *has* presented) a *threat* of immediate and serious harm (but not necessarily *actual* harm) is actionable under RCRA.[20] However, injunctive relief is inappropriate "where the risk of harm is remote in time, completely speculative in nature, or *de minimis* in degree." *United States v. Reilly Tar & Chemical Corp.*, 546 F. Supp. 1100, 1109 (D. Minn. 1982); *cf. W.R. Grace & Co. v. EPA*, 261 F.3d 330, 339-40 (3d Cir. 2001) (citing this language in connection with EPA's emergency authority under RCRA).

The leading case in the Third Circuit on the standard for RCRA liability is *Interfaith Community Organization v. Honeywell International, Inc.*, 399 F.3d 248 (3d Cir. 2005). In *Interfaith*, a local community organization sued the owner of a chromate chemical plant under RCRA. *Id.* at 252. The manufacturing process at the plant produced waste residue with a high pH and high concentrations of hexavalent chromium, a highly soluble chemical that is a known to be

---

[20] Tri-Realty correctly points out that Ursinus misstates the RCRA standard in two important ways. First, Ursinus repeatedly omits the word "may" from the "imminent and substantial endangerment" phrase. Tri-Realty need only prove that the No. 6 oil at and around College Arms "*may* present an imminent and substantial endangerment to health or the environment," 42 U.S.C. § 697(a)(1)(B) (emphasis added), not that it already presents such an endangerment. Second, Ursinus repeatedly replaces the phrase "health *or* the environment" with "health *and* the environment," which suggests that both health and the environment must face a sufficient risk of endangerment before a party may be liable under RCRA. However, Tri-Realty need only prove that the No. 6 oil at and around College Arms "may present an imminent and substantial endangerment to health *or* the environment," *id.* (emphasis added), and a sufficient risk of endangerment to one may result in RCRA liability even in the absence of a sufficient risk of endangerment to the other.

very carcinogenic to humans and toxic to the environment. *Id.* The plant owner had piled this waste at a tidal wetlands site along the Hackensack River, and the site contained 1.5 million tons of waste, 15 to 20 feet deep, across approximately 34 acres. *Id.* The district court ruled that "a site may present an imminent and substantial endangerment within the meaning of RCRA where: (1) there is a potential population at risk; (2) the contaminant at issue is a RCRA 'solid' or 'hazardous waste'; (3) the contaminant is present at levels above that considered acceptable by the state; and (4) there is a pathway for current and/or future exposure." *Id.* at 259 (quoting *Interfaith*, 263 F. Supp. 2d at 838) (internal quotation marks omitted).

On appeal, the Court of Appeals rejected two parts of the district court's analysis as "irreconcilable" with the standard for liability under RCRA. *Id.* First, because RCRA uses disjunctive rather than conjunctive phrasing in connection with possible endangerments to health *or* the environment, the Court of Appeals concluded that a possible endangerment to either health *or* the environment would be sufficient to find RCRA liability. The Court of Appeals rejected the notion that RCRA liability *requires* that there be a potential population at risk, and found instead that "environmental endangerment" may be "all that is required under § 6972(a)(1)(B), which imposes liability for endangerments to the environment, including water in and of itself." *Id.* at 263.[21] Second, the Court of Appeals noted that RCRA's language "does not support one particular type of quantification measurement," and there are no cases that "require a particular quantitative showing as a *sine qua non* for liability." *Id.* at 260. Consequently, the Court of Appeals concluded that RCRA does not require that the contaminant be present at levels considered unacceptable by the state. As the *Interfaith* court explained, "[w]e do not believe that Congress intended § 6972(a)(1)(B) to be dependent upon the states in such a

---

[21] The Court of Appeals did not explain what constitutes "environmental endangerment" when such "endangerment" is not measured in terms of threatened harm to the life or health of a human, animal, or plant population. *See infra* Part III.B.2.d.

manner, and the statutory language provides no support for such dependency." *Id.* Therefore, although quantitative showings are still important to any endangerment determination under RCRA,[22] plaintiffs need not prove contamination in excess of relevant state standards.[23]

Ultimately, notwithstanding the district court's error in requiring the plaintiff to meet a higher burden of proof than RCRA actually requires, the Court of Appeals found that the district court's "imminent and substantial endangerment determination was not clearly erroneous." *Id.* at 264. In support of that conclusion, the Court of Appeals considered the totality of the circumstances, including: (1) evidence of the pollutant's concentration, (2) evidence of pathways

---

[22] Tri-Realty argues that there are no cases making the physical extent of contamination a determinant of whether an imminent and substantial endangerment may exist, and that a purely "qualitative" showing may suffice to establish RCRA liability. (*See* Pl.'s RCRA Br. 14). But those arguments mischaracterize the nature of the endangerment determination in two ways. First, although there is no specific quantitative threshold for RCRA liability, purely qualitative characterizations of contamination may be insufficient to establish the risk of an imminent and substantial endangerment. There is typically some quantitative basis for determining the degree and duration of exposures that may result in substantial and imminent endangerments to health or the environment. In other words, although it may be possible under some circumstances to prevail in a RCRA citizen suit without any quantitative evidence, the absence of quantitative evidence may also prevent a court from making an endangerment determination. Second, although there is no requirement that a certain amount of contamination exist to give rise to RCRA liability, the amount of contamination still matters insofar as more contamination often leads to an increased risk of harm. Thus, although a reasonable factfinder could not conclude that a small amount of contamination presents no endangerment simply because it is small, that factfinder could conclude that a small amount of contamination presents no endangerment because the contaminant is only dangerous in greater amounts.

[23] In light of this holding in *Interfaith*, logic suggests that proof of contamination in excess of relevant state standards will not necessarily result in RCRA liability. The ultimate basis for RCRA liability is the prospect of contamination that may present an imminent and substantial endangerment to health or the environment, but states may adopt standards that have no relation to any threat of harm to health or the environment. For example, in order to deter pollution, states may adopt standards that are so restrictive that contamination in excess of those standards may not pose any serious risk of imminent harm. Thus, in order to succeed on a RCRA claim, a plaintiff relying on the fact that certain contamination exceeds relevant state standards must also show that such an overage is a useful proxy for the existence of an imminent and substantial endangerment to health or the environment. *See Lewis v. FMC Corp.*, 786 F. Supp. 2d 690, 710 (W.D.N.Y. 2011) ("Without any evidence linking the cited standards to potential imminent and substantial risks to human health or wildlife, reliance on the standards alone presents merely a speculative prospect of future harm, the seriousness of which is equally hypothetical.").

for exposure to both humans and the environment, (3) evidence of the failure or inadequacy of

interim remedial measures, (4) evidence of human trespass or animal presence on the polluted

site, (5) expert opinions that the pollutant was responsible for certain adverse effects, (6)

evidence of the amount of contamination that was toxic, (7) evidence that the pollutant was

present in groundwater in an amount hundreds or thousands of times greater than the relevant

statewide health standard, and (8) experts opinions as to the cumulative facts establishing the

substantialness of the endangerments. *Id.* at 261-64.

Because courts consider the totality of the circumstances in citizen suits under RCRA, the

specific factors previously considered by the *Interfaith* court are by no means exhaustive, and

proof that one or several of those factors cuts against RCRA liability does not necessarily

preclude the possibility of RCRA liability or justify summary judgment for the defendant. *See,*

*e.g.*, *Bd. of Cnty. Comm'rs v. Brown Grp. Retail, Inc.*, 768 F. Supp. 2d 1092 (D. Colo. 2011)

(concluding that the involvement of a state environmental agency weighed against finding an

imminent and substantial endangerment); *Davies v. Nat'l Cooperative Refinery Ass'n*, No. 96-

1124, 1996 WL 529208, at *8-9 (D. Kan. July 12, 1996) (concluding that "any imminent risk to

the plaintiffs' health has been diminished by plaintiffs' awareness that their water should not be

consumed and by the availability of an alternative water supply"). Indeed, a variety of factors—

including "the dose (how much), the duration (how long), the route or pathway by which you are

exposed (breathing, eating, drinking, or skin contact), the other chemicals to which you are

exposed, and your individual characteristics such as age, sex, nutritional status, family traits,

lifestyle, and state of health," (Public Health Statement, Polycyclic Aromatic Hydrocarbons

(PAHs), Agency for Toxic Substances and Disease Registry (Aug. 1995), *available at*

http://www.atsdr.cdc.gov/ToxProfiles/tp69-c1-b.pdf)—will determine the type and severity of

harm that contamination may cause to human health or the environment. Therefore, although courts consider the totality of the circumstances when evaluating a RCRA claim, evidence regarding the likelihood and degree of human and/or environmental exposure to contamination, along with the risks associated with such exposure, is most likely to assist courts in making endangerment determinations under RCRA. *See id.* at 259, 261-62; *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 213-14 (2d Cir. 2009).

This Court is not alone in requiring that RCRA plaintiffs present evidence regarding the likelihood and degree of human and/or environmental exposure to alleged contamination. In *Cordiano v. Metacon Gun Club, Inc.*, the plaintiffs alleged that the defendant's operation of a shooting range resulted in discharges of lead that violated RCRA. 575 F.3d at 209. Despite the existence of an expert report stating that "firing-range-related contaminants on the site . . . represent[] a potential exposure risk to both humans and wildlife," *id.* at 204, the Second Circuit Court of Appeals concluded that summary judgment in favor of the defendant was proper. In particular, although the court noted that there was evidence of potential risks to human health posed by long-term exposure to lead, the court observed that there was "no evidence that anyone is subject to long-term exposure to lead contamination at the [defendant's] site, or that there are realistic pathways of exposure there." *Id.* at 213. Absent evidence of both the nature of the risk posed by the contamination and the potential for exposure of the necessary type and duration for that risk to result in harm, there was insufficient evidence for a reasonable factfinder to conclude that the waste may present an imminent and substantial endangerment to health or the environment.

Similarly, there is ample judicial precedent for requiring that RCRA plaintiffs present evidence regarding the risks associated with exposure to alleged contamination. In *Leese v.*

*Lockheed Martin Corp.*, for example, the plaintiff sued the defendant under RCRA for allegedly

releasing two harmful substances into the environment. *See* No. 11-5091, 2014 WL 3925510, at

*1 (D.N.J. 2014). The plaintiffs' evidence that the substances "may present an imminent and

substantial endangerment" consisted of (1) a federal regulation deeming the substances at issue

to be hazardous waste, (2) the fact that the substances were present on plaintiffs' properties, (3) a

description of the substances, including background exposure levels, reference concentrations,

and "health hazard information" regarding its effects, (4) an expert's opinions about the possible

health effects of the substances,[24] and (5) a "Toxicological Profile" for one of the substances. *Id.*

at *11. The district court concluded that this showing was inadequate to support a claim under

RCRA because the plaintiffs provided "no evidence and no expert testimony that [the

substances] may pose a substantial risk of harm to health or the environment at *levels detected* on

and around Plaintiffs' properties." *Id.* Without sufficient evidence that a pollutant may be

dangerous in the form in which it may exist at the allegedly contaminated site, no reasonable

factfinder could conclude that a substantial and imminent endangerment to health may exist

there.

    To determine whether the situation at College Arms may present a substantial and

imminent endangerment to health or the environment, the Court will (1) consider the evidence of

pathways by which humans or the environment may be exposed to the No. 6 oil from the Ursinus

USTs, (2) consider the evidence of the threatened harm that may result from exposure to the No.

6 oil from the Ursinus USTs, (3) determine whether the evidence of exposure pathways and risks

associated with No. 6 oil satisfy the requirements for liability under RCRA; and (4) articulate the

---

[24] The expert report offered opinions only as to whether the substances are "reasonably
anticipated" to be carcinogens and "can affect" human health. *Leese*, 2014 WL 3925510, at *7.

proper standard for determining whether there may be an imminent and substantial

endangerment to the environment "in and of itself."

a.      Evidence of Exposure Pathways

To survive summary judgment, Tri-Realty must present non-speculative evidence of a

potential exposure pathway at College Arms that may present an imminent and substantial

endangerment to health or the environment. Because different exposure pathways exist for

humans as opposed to other living populations of plants and animals, the Court will address them

separately. Additionally, because the endangerment determination with respect to non-living

elements of the environment presents substantially different considerations requiring additional

explanation, the Court will address those separately. *See infra* Part III.B.2.d.

i.      Pathways for Exposure to Humans

With respect to human exposure pathways, it is undisputed that there is no evidence that

humans drink any of the allegedly contaminated water in Bum Hollow or eat any of the animals

or plants that live or grow in Bum Hollow. Rather, Tri-Realty has presented three types of

evidence relating to potential human exposure: (1) evidence that people are present in Bum

Hollow,[25] (2) evidence that people live near Bum Hollow,[26] and (3) evidence that oil might

---

[25] Tri-Realty's evidence that there are people present in Bum Hollow includes (1) Dr. Dalbey's deposition testimony that children may enter the Impoundment, (2) Mr. Marshall's observation that someone had thrown watermelon-sized chunk of concrete into the Impoundment, (3) Mr. Marshall's observation of paintball pellets in and near the Impoundment, and (4) the affidavit of David Rodenbaugh, an employee of DiLucia Management Corporation, reporting that he has seen teenagers and college students in Bum Hollow, and (5) the Ambron Affidavit, along with accompanying photographs of an empty Gatorade bottle and other trash, suggesting that humans are present in Bum Hollow.

[26] Tri-Realty's evidence that people live near Bum Hollow includes the Ambron Affidavit, which noted the existence of at least two residential complexes (including College Arms) near Bum Hollow.

surface at new locations at College Arms.[27] The Court finds that all three types of evidence demonstrate the possibility of acute, intermittent exposures to oil and oil-contaminated water at College Arms, but that only the third type of evidence demonstrates the possibility of extended, repeated exposures.

The fact that people spend time in Bum Hollow is practically beyond dispute. In numerous affidavits, various employees of the DiLucia Management Corporation and other witnesses claim to have seen people, including teenagers and college students, in Bum Hollow. (*See, e.g.*, Pl.'s Ex. 141 ¶¶ 5-12). Tri-Realty has also presented circumstantial, albeit regrettable, evidence that people spend time in Bum Hollow, such as an empty Gatorade bottle and other trash. (*See* Pl.'s Ex. 142). In addition, the fact that a nature trail passes through Bum Hollow and that two residential complexes exist in close proximity to Bum Hollow constitutes circumstantial evidence that people likely do spend time in Bum Hollow. (*See* Pl.'s Ex. 80 at 7; Pl.'s Ex. 142). From this evidence, a reasonable factfinder may infer that there is some risk that people may be exposed to oil and oil-contaminated water on the surface of Bum Hollow.

At the same time, Tri-Realty asks the Court to draw two impermissibly attenuated inferences from this evidence. First, Tri-Realty claims that there is substantial evidence that *children* are likely to be exposed to oil and oil-contaminated water in Bum Hollow, but much of the evidence about the likelihood of such exposures is speculative. For example, Dr. Dalbey testified that "there is a certain possibility" of children playing in Bum Hollow coming into contact with the Impoundment. (*See id.* 69:8-17 ("And I would think that they would get down into the area and it would be easy for them to get into the impoundment.")). Similarly, Mr. Marshall testified that someone threw a chunk of concrete into the Impound and shot

---

[27] Tri-Realty's evidence that oil might surface at new locations at College Arms includes the evidence and opinion reflected in the expert reports of Mr. Duchaine and Dr. Smith.

paintball pellets in Bum Hollow, and speculated that it was children who did so. (*See* Pl.'s Ex. 121 at 53:2-4). Even drawing all reasonable inferences in favor of Tri-Realty, it would be pure speculation to conclude from such testimony that children (of unknown and unknowable ages) are particularly likely to be exposed to oil or oil-contaminated water or that there is a serious risk of repeated exposure.

Second, the Court cannot infer from the evidence in the record that there is a serious risk of extended or repeated human exposures to oil or oil-contaminated water in Bum Hollow. The fact that people spend time in and live near Bum Hollow demonstrates only that there is a periodic human presence in Bum Hollow. It does *not* demonstrate that *the same* individuals regularly spend time in Bum Hollow or that those individuals engage in activities in Bum Hollow that might lead to repeated exposures to oil or oil-contaminated water. From the evidence in the record, the only reasonable inference that a factfinder may draw is that there is a risk of acute, intermittent exposures to oil or oil-contaminated water.

Nevertheless, the Court finds that if Tri-Realty proves that there is a serious risk that the oil at Bum Hollow will spread and pond on the surface of a nearby residential complex such as College Arms, then there may be sufficient evidence to establish a serious risk of extended or repeated exposures to oil or oil-contaminated water. Tri-Realty has presented evidence that oil is ponding on the surface at College Arms and that oil has moved and will continue to move beyond the Clubhouse. (*See* Pl.'s Ex. 97 at 1, 7; Pl.'s Ex. 98 at 7 & fig. 1; *but see* Pl.'s Ex. 114 at 19:13-22:14). Tri-Realty's expert opined that underground oil is spreading across College Arms and threatens to surface at locations in Bum Hollow, as well as inside different buildings at College Arms. (*See* Pl.'s Ex. 46 at 10; Pl.'s Ex. 97 at 10 & fig. 5; Pl.'s Ex. 98 fig. 1; *but see* Pl.'s Ex. 97 at 10). Although Ursinus's expert reached the opposite conclusion, drawing all reasonable

inferences in favor of Tri-Realty, the Court finds that Tri-Realty may have presented sufficient evidence to demonstrate complete exposure pathways not just for acute, intermittent exposures, but also for prolonged, repeated exposures. For example, if the Court credits Tri-Realty's expert, it could find that there is a serious risk of repeated exposures, either through dermal exposures or inhalation, if oil expresses in or around one of the buildings at College Arms.

In response to the above-mentioned evidence, Ursinus relies on the Kleinfelder Report, in which Ursinus's expert concluded that there is no pathway for human exposure to oil. Ursinus argues that Tri-Realty's failure to introduce into evidence an expert report in response to the Kleinfelder Report means that Tri-Realty's RCRA claim must fail. However, the Court finds that Tri-Realty's evidence is sufficient to establish that the human presence in Bum Hollow may result in acute human exposures to oil, and that the spread of oil may result in prolonged human exposures to oil. The Kleinfelder Report concluded that the oily material at College Arms will not present an imminent and substantial endangerment to human health due to the magnitude and frequency of potential exposures to human receptors. (*See* Def.'s RCRA Ex. 20 at 1). To reach this conclusion, the Kleinfelder Report considered numerous exposure points—including the buildings at College Arms, the Clubhouse drain and sump pump system, the Impoundment, the Drainage Swale, the Hillside Pipe, Bum Hollow Run, the Detention Basin, and the Perkiomen Creek—and concluded that there was no evidence of likely human exposure to oily material at those sites. (*Id.* at 10-17). Indeed, a separate report commissioned by Tri-Realty specifically concluded that the risk of harm from vapor intrusion in the buildings located at College Arms "is low and is unlikely to occur." (Def.'s RCRA Ex. 33 at 29-30). However, as described above, Tri-Realty has presented evidence suggesting that there may be a risk of acute, intermittent exposures in Bum Hollow under the circumstances as they presently exist, and that there may be

41

a risk of repeated exposures due to the potential spread of oil. Therefore, whether or not there is a serious risk of complete exposure pathways is a disputed issue of fact that is material to the outcome of Tri-Realty's RCRA claim. *See infra* Part III.B.2.c.

ii.     Pathways for Exposure to Animals & Plants

With respect to animal and plant pathways for exposure, a reasonable factfinder could conclude that there is a serious risk that complete pathways may exist for both acute and prolonged exposures. Tri-Realty has presented several pieces of evidence suggesting that animals can and do encounter oil and oil-contaminated water in Bum Hollow. (*See, e.g.*, Pl.'s Ex. 80 at 5 (reporting sightings of salamanders and crayfish in Bum Hollow Run); Pl.'s Ex. 121 at 43:4-16 (reporting sightings of "frogs in the [I]mpoundment" and salamanders "underneath absorbent pads" near the Impoundment); *id.* at 51:7-52:8 (reporting sightings of people walking their dogs along Bum Hollow Road, and deer and squirrels near Bum Hollow); Pl.'s Ex. 141 ¶¶ 5-12 (reporting sightings of teenagers, college students, dogs, wild turkeys, ducks, deer, squirrels, skunks, raccoons, rabbits, and feral cats in Bum Hollow); Pl.'s Ex. 139 ¶¶ 5-6 (reporting sightings of red foxes and opossums in Bum Hollow); Pl.'s Ex. 142 at Exs. F, G, H (appearing to show a frog, a salamander, and worms in oil-contaminated water and soil)). Tri-Realty has also presented evidence suggesting that various plants in Bum Hollow encounter oil and oil-contaminated water. (*See, e.g.*, Pl.'s Ex. 80 at 55-56 (appearing to show oil and oil-contaminated water outside the Impoundment and in close proximity to plants). Although Tri-Realty's evidence is virtually entirely anecdotal, the Court may infer from it that the animals and plants in Bum Hollow are at risk of encountering oil and oil-contaminated water on a routine basis.[28]

_____

[28] Tri-Realty's anecdotal evidence regarding animals and plants is sufficient to demonstrate a risk of prolonged exposure, even though similar anecdotal evidence regarding humans was insufficient to demonstrate such a risk, due to the different inferences that may reasonably be drawn from the anecdotal evidence. Based on the scattered evidence of human

There is no evidence to suggest (or reason to believe) that the anecdotal evidence is

unrepresentative of the general situation in Bum Hollow. As a result, the Court finds that there is

evidence from which a reasonable factfinder may conclude that there is a serious risk of animals

and plants facing acute or prolonged exposure to oil constituents in Bum Hollow.

b.      Evidence of Risks from Exposure

The inquiry does not stop there, however. To survive summary judgment, Tri-Realty

must also present evidence of the degree of exposure that "may present an imminent and

substantial endangerment to health or the environment." It is undisputed that prolonged exposure

to high concentrations of No. 6 oil could seriously increase the risk of adverse effects in humans

and animals.[29] (*See* Pl.'s RCRA Ex. 96 at 6 ("The main concern with No. 6 fuel oil and other

heavy fuel oils is toxicity from repeated contact."); Def.'s RCRA Ex. 20 at 19 (explaining that

the development of chemically-induced cancer usually depends on repeated exposure to a

carcinogen over a relatively long period of time, such as months or years)). However, the parties

dispute whether intermittent contact with No. 6 oil may result in serious risks of adverse effects

in humans and animals. Ursinus has presented evidence that intermittent contact with No. 6 oil

does not create a serious risk of harm to humans, animals, or plants. The Kleinfelder Report

states that the risk of adverse effects is a function of the composition of the No. 6 fuel oil, the

pattern of exposure, the route of exposure, the characteristics of the individual exposed, and the

duration of exposure. (*See* Pl.'s Ex. 20 at 19-20). According to the Kleinfelder Report, absent

high concentrations of harmful oil constituents, No. 6 fuel oil demonstrates a low level of

presence in Bum Hollow, it would be unreasonable to infer that people live outdoors or spend
prolonged periods of time there. However, because it may be reasonable to infer that the wild
animals and plants observed in Bum Hollow generally live outdoors, it may be reasonable to
infer that they are present in Bum Hollow for extended periods of time.

[29] For a discussion of what constitutes an imminent and substantial endangerment to the
environment "in and of itself" (i.e., the environment separate and apart from any living
population), see *infra* Part III.B.2.d.

toxicity after acute duration exposures, and cancerous and non-cancerous effects are unlikely to

occur based on infrequent exposures to small amounts of oily material at College Arms.  (*Id.*).[30]

Tri-Realty's evidence regarding the risks associated with exposure to the alleged

contamination at College Arms consists of (1) Dr. Dalbey's expert report finding samples from

College Arms to be carcinogenic and mutagenic, (2) Dr. Dalbey's post-discovery affidavit, and

(3) numerous Material Safety Data Sheets for No. 6 oil.[31] A reasonable factfinder could not find,

based on Dr. Dalbey's expert report and post-discovery affidavit, that intermittent dermal

exposure to the No. 6 fuel oil released from the Ursinus USTs may present an imminent and

substantial endangerment to humans, animals, or plants. The expert report "addresses some of

the toxicological aspects of three samples of oil," and concludes that the three samples Dr.

Dalbey analyzed from College Arms were each carcinogenic and mutagenic, meaning that they

"induce tumors in virtually all the mice in a skin-painting assay." (Pl.'s Ex. 96 at 4, 6). Although

Dr. Dalbey wrote that "some components used in No. 6 fuel oil can have significant toxicity

when administered orally or dermally to lab animals at very high doses," and that "the lowest

daily dose that resulted in adverse effects was less than 8 mg/kg (<0.5 g for a 70 kg human)," his

report provides no basis from which a reasonable factfinder could conclude that infrequent

---

[30] Dr. Dalbey objects to the Kleinfelder Report on the grounds that it is "superficial, incomplete, and lacking in the basic elements of a risk assessment" because the report's "qualitative" statements did not address data on the samples or perform any analysis. (*See* Pl.'s Ex. 144 ¶ 13). That Tri-Realty makes such an objection to the Kleinfelder Report is ironic. Dr. Dalbey opined that, "qualitatively the PAC levels in these samples raise concerns of possible noncarcinogenic effects on multiple organs in the body as well as on unborn fetuses if repeated dermal exposure occurs." (Pl.'s Ex. 96 at 3). Tri-Realty repeatedly urges the Court to rely on its experts' qualitative statements regarding risks, and it is not the case that qualitative statements will only suffice to support and not undermine its position.

[31] Notably, there is no evidence in the record explaining the risks associated with contamination in excess of the Pennsylvania statewide health standards, which are themselves matters of dispute between the parties. Therefore, on this record, the Court cannot find that an imminent and substantial endangerment may exist based on evidence that the contamination at College Arms exceeds one or more statewide health standards. *See supra* note 23.

exposures to No. 6 fuel oil may have serious effects on living populations. (*Id.* at 6). Dr. Dalbey at no point explains the type of adverse effects that may result from intermittent contact with small amounts of No. 6 oil, or the type of adverse effects that No. 6 oil may have on plants.

Similarly, Dr. Dalbey's affidavit contains no facts from which a reasonable factfinder could conclude that infrequent exposure to No. 6 oil may result in severe adverse effects in humans, animals, or plants. The statements in Dr. Dalbey's affidavit are either conclusory or insufficient. For example, Dr. Dalbey avers that an "imminent and substantial endangerment to humans, animals and the environment in Bum Hollow exists," (Pl.'s Ex. 144 ¶ 5), but he does not state the particular facts that lead him to reach that conclusion. Similarly, Dr. Dalbey's assertion that "one has to question whether the general public should be exposed to a material" like No. 6 oil is hardly sufficient grounds for denying summary judgment. (*Id.* ¶ 10). Dr. Dalbey also avers that "any estimate of possible effects following limited dermal exposures would need to compensate for exposures of children and also the possibility that exposures to other agents might exacerbate such effects." (*Id.* ¶ 9). However, Dr. Dalbey himself does not provide any estimate that specifically accounts for exposure to children[32] or exposure to other agents. Nor does Dr. Dalbey's affidavit reflect any opinion or evidence about the type of adverse effects that No. 6 oil may have on plants. Dr. Dalbey's affidavit is therefore incapable of establishing the seriousness of intermittent contact with No. 6 oil.

In contrast, the MSDSs for No. 6 oil attached to Dr. Dalbey's affidavit could permit a reasonable factfinder to conclude that intermittent contact with No. 6 oil poses a potentially serious risk to humans and animals.[33] In his affidavit, Dr. Dalbey avers that "a sampling of

---

[32] As explained above, there is no evidence that children are especially likely to be exposed to contamination at College Arms. *See supra* Part III.B.2.a.i.

[33] The MSDSs do not discuss the type of adverse effects that No. 6 oil, in the amounts present at College Arms, may have on plants.

warnings on readily available Material Safety Data Sheets for No. 6 fuel oil from some of the companies that sell it[34] generally include warnings regarding cancer, potential reproductive hazard, and effects in multiple organs . . . . Suppliers warn explicitly or implicitly that personal contact should be avoided and provide procedures to avoid such contact." (*Id.* ¶ 8). Those MSDSs that address acute toxicity generally state that No. 6 oil is minimally toxic. *See, e.g.*, Material Safety Data Sheet, ExxonMobil Corp., Marine Fuel Oil 9 (Mar. 28, 2014) ("Minimally Toxic"; "May dry the skin leading to discomfort and dermatitis."); Material Safety Data Sheet, CITGO Petroleum Corp., No. 6 Fuel Oil 2 (Feb. 16, 2006) ("May cause skin irritation with redness, an itching or burning feeling, and swelling of the skin."); Material Safety Data Sheet, Hess Corp., No. 6 Fuel Oil 7 (Aug. 30, 2012) ("Practically non-toxic if absorbed following acute (single) exposure."); Material Safety Data Sheet, Petro-Canada, Residual Fuel Oil #6/Heavy Marine Bunker 2 (Dec. 20, 2011) ("Irritating to skin. May cause sensitization by skin contact."); Material Safety Data Sheet, Valero Mktg. & Supply Co. & Affiliates, No. 6 Fuel Oil 7 (Jan. 6, 2012) ("Harmful if inhaled, absorbed through skin, or swallowed."). Indeed, the MSDSs stress that prolonged exposure is likely to result in serious adverse health risks, such as serious skin conditions and heightened risks of cancer. *See, e.g.*, Material Safety Data Sheet, Petro-Canada, Residual Fuel Oil #6/Heavy Marine Bunker 2 (Dec. 20, 2011) ("Can cause cancer. *Risk of cancer depends on duration and level of exposure*." (emphasis added)); Material Safety Data Sheet, ExxonMobil Corp., Marine Fuel Oil 3 (Mar. 28, 2014) ("Under conditions of poor personal hygiene and prolonged repeated contact, some polycyclic aromatic compounds (PACs) have been suspected as a cause of skin cancer in humans."). However, at summary judgment, the

---

[34] As Dr. Dalbey himself stresses, no two types of No. 6 oil are the same, as they are made up of mixtures of different components. This means that the MSDSs attached to his affidavit, while generally relevant to the question relating to No. 6 oil, may ultimately fail to provide a sufficient basis for finding that the particular variety spilled from the Ursinus USTs and present at College Arms exhibits all of the characteristics mentioned in them.

Court is not prepared to find that the potential health risk from intermittent contact with No. 6 oil—skin irritation—is not potentially serious. Thus, even though the risk from intermittent exposure is not nearly as serious as the risk from prolonged exposure, and there is no evidence in the record regarding the risk of harm to plants resulting from intermittent or prolonged exposure to No. 6 oil in the amounts present at College Arms, Tri-Realty and Ursinus have introduced evidence to support their respective positions regarding the risk of harm to humans and animals resulting from intermittent contact with No. 6 oil.

### c.    Application

Viewing the evidence in the record in the light most favorable to Tri-Realty, as the Court is obligated to do at this stage of the litigation, the Court finds that disputed issues of material fact preclude the entry of summary judgment with respect to Tri-Realty's RCRA claim based on any alleged endangerment to humans and/or animals. In particular, the parties specifically dispute (1) the danger posed to humans and animals by intermittent contact with No. 6 fuel oil, and (2) the likelihood of a complete pathway for prolonged human exposures to No. 6 fuel oil. However, the Court will grant summary judgment in favor of Ursinus with respect to Tri-Realty's RCRA claim based on any alleged endangerment to plants at College Arms.

Tri-Realty has presented evidence demonstrating that humans and animals may suffer some apparently mild adverse effects due to acute dermal exposures to No. 6 oil. But in the Third Circuit, an endangerment is "substantial" if "there is some reasonable cause for concern that someone or something may be exposed to a risk of harm . . . if remedial action is not taken." *Interfaith*, 399 F.3d at 259 (quoting *United States v. Union Corp.*, 259 F. Supp. 2d 356, 399-400 (E.D. Pa. 2003)). There is nothing in the record to indicate that intermittent contact with No. 6 oil will only result in *insubstantial* skin irritation, and the Court must draw all reasonable inferences

in favor of Tri-Realty. Thus, at this stage of the litigation, the Court will not assume that the risk of skin irritation from oil at College Arms is not potentially serious enough to meet the low bar established by precedent, so the risk of skin irritation may, under appropriate circumstances, pose a sufficiently serious danger to result in RCRA liability. Although the Kleinfelder Report states that No. 6 fuel oil tends to demonstrate a low level of toxicity after acute duration exposures, meaning "that single exposures or repeated exposures over a short period of time require relatively high concentrations of fuel oil to cause an adverse health effect," (Def.'s RCRA Ex. 20 at 19), and it is undisputed that Tri-Realty cannot provide a reliable approximation of how much oil remains at College Arms as a result of the release from the Ursinus USTs, there is some evidence that there is oil present on the surface of Bum Hollow and that humans and animals may have acute exposures to it. That intermittent contact with oil could result in skin irritation and, by extension, RCRA liability.

Tri-Realty has also presented evidence suggesting that animals in Bum Hollow may be subject to prolonged exposure to No. 6 oil, and that such prolonged exposure may result in legally "serious" risks of harm. *See supra* Part III.B.2.a.ii. There is evidence that that the oil at College Arms is mutagenic and carcinogenic, and that living populations are exposed to oil constituents when animals like frogs and salamanders gain access to the Impoundment. Viewing those facts together, there is sufficient evidence from which a reasonable factfinder may conclude that an imminent and substantial endangerment to living populations in the environment *may* exist. *See Prisco v. State of New York*, 902 F. Supp. 374, 395 (S.D.N.Y. 1995). Although Tri-Realty has presented no evidence of any animals dying or being sick as a result of the oil at College Arms, Tri-Realty has one study finding that the oil constituents present at College Arms are toxic and anecdotal evidence about the amount of exposure that animals may

48

have to those constituents. Drawing all reasonable inferences in favor of Tri-Realty, that evidence is just enough to survive summary judgment because it suggests that animals are present near mutagenic and carcinogenic oil, that their exposure to oil may be continuous and prolonged, and that adverse effects may result.

In contrast, the evidence suggesting that humans might face prolonged exposure to No. 6 oil is extremely limited. As explained above, the only evidence to that effect is the opinion of Tri-Realty's expert that No. 6 oil from the Ursinus USTs is moving across College Arms, threatening to surface in places frequented by College Arms residents. *See supra* Part III.B.2.a.i.[35] Although Ursinus has presented evidence and expert testimony to suggest that the No. 6 oil at College Arms is largely captured underground and there is little to no risk that it will migrate to portions of College Arms where it might pose a serious threat to humans, the result is a disputed issue of material fact that must be resolved at trial: if the Court credits Ursinus's evidence and expert, it could find that there is no risk of a substantial endangerment; if the Court credits Tri-Realty's evidence and expert, it could find that there may be such a risk.

There is no evidence in the record to suggest that circumstances at College Arms may present a substantial endangerment to human health in any other way. In other words, apart from these two potential pathways of exposure, there is no evidence to substantiate Tri-Realty's RCRA claim with respect to human health. Thus, at trial, Tri-Realty will not be permitted to

---

[35] Although the *Interfaith* court found the evidence of human presence at the contaminated site sufficient to support RCRA liability, the Court finds the circumstances in this case (other than the possibility that No. 6 oil will spread to locations at College Arms frequented by humans) quite different. In *Interfaith*, the contamination was much more widespread and severe, so any human presence on the subject site increased the likelihood of harmful exposure. *See* 399 F.3d at 252 (noting that the site consisted of "some 1,500,000 tons of the waste, 15 to 20 feet deep, on some 34 acres"). Here, the only evidence in the record on the types of exposures that may be harmful suggests that oil constituents must be present in high concentrations or exposures must be for extended periods of time before there is any appreciable increase in the risk to human health. Evidence of the occasional presence of people in Bum Hollow cannot demonstrate that there may be a risk of harm from prolonged exposure.

revisit the issue of whether there is a risk of acute exposure via ingestion or a risk of prolonged exposure from human presence near the Impoundment or otherwise in Bum Hollow. Rather, the trial with respect to the endangerment to human health will be restricted to the two theories of liability described above, namely the likelihood and seriousness of any harm that may result from isolated dermal exposures to oil and oil-contaminated water, and the likelihood and seriousness of completed pathways for prolonged dermal and respiratory exposures to humans based on the threat that oil might surface at new locations, including within additional buildings at College Arms. Apart from those two theories of liability, the record in this case suffers from the same deficiencies with respect to human health as the records in *Leese* and *Cordiano*, and no reasonable factfinder could conclude that a substantial endangerment to human health may exist at College Arms because there is insufficient evidence connecting the danger posed by the levels of contamination to any imminent pathways for human exposure.

Similarly, the Court will grant summary judgment with respect to any claims that Ursinus is liable under RCRA for an imminent and substantial endangerment to plants at College Arms. As noted above, there is no evidence in the record of any plants suffering or dying as a result of the oil at College Arms, and there is no evidence—factual or opinion—explaining how the level of contamination at College Arms constitutes an imminent and substantial endangerment to the plants at College Arms. The expert opinions offered by Tri-Realty address only the endangerment posed to humans and animals, so a reasonable factfinder would have to speculate in order to determine the danger posed by oil to the plants at College Arms. Claims may not survive summary judgment based on speculation. *See, e.g.*, *Lexington Ins. Co. v. W. Pennsylvania Hosp.*, 423 F.3d 318, 333 (3d Cir. 2005) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of

summary judgment." (quoting *Hedberg v. Indiana Bell Telephone Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995)).

The Court gives all due deference to the word "may" in the statute, but Tri-Realty relies too much on the notion that an endangerment to human health need not actually exist for there to be a finding of RCRA liability. The word "may" must be assessed at this stage of the litigation, and at summary judgment, the issue is whether the movant is entitled to judgment as a matter of law based on the undisputed material facts of record. *See* Fed R. Civ. P. 56. The movant is permitted to point to the absence of evidence to explain that the Plaintiff cannot meet its burden given the evidence in the record. *See Celotex*, 477 U.S. at 325. That is the case here. Just like the plaintiffs in *Leese* and *Cordiano*, Tri-Realty has introduced some evidence that No. 6 oil can be toxic and that it is present in some form at College Arms. However, except for a few narrow theories of liability, Tri-Realty has failed to connect the necessary dots for its claim to survive summary judgment.

To summarize, the Court will grant summary judgment as to Tri-Realty's RCRA claim except with respect to the possible endangerment of the environment "in and of itself," *see infra* Part III.B.2.d, and except with respect to the following theories of liability: (1) that humans and animals may face an imminent and substantial endangerment as a result of intermittent exposure to contamination at College Arms; (2) that animals may face an imminent and substantial endangerment as a result of prolonged exposure to contamination at College Arms; and (3) that humans may face an imminent and substantial endangerment as a result of the spread of contamination to locations at College Arms that might result in prolonged human exposure to contamination.[36]

_____

[36] Ursinus also argues that Tri-Realty "should not be afforded equitable relief pursuant to RCRA because it has by its own actions and the obstreperous tactics of its counsel and consultant

d.  Imminent and Substantial Endangerment to Environment In and Of Itself

Under *Interfaith*, an imminent and substantial endangerment to the environment may give rise to RCRA liability even in the absence of a threatened living population. *See* 399 F.3d at 263; *see also supra* Part III.B.2. In the words of our Court of Appeals, § 6972(a)(1)(B) "imposes liability for endangerments to the environment, *including water in and of itself*." 399 F.3d at 263 (emphasis added). Thus, in *Interfaith*, assuming *arguendo* that there was no human endangerment, the court observed that the defendant "concede[d] the groundwater at the Site [wa]s in 'danger' because it [wa]s so highly contaminated by hexavalent chromium," and "multiple experts in the areas of human health and/or ecological risk opined as to the cumulative facts establishing the substantialness of the endangerments." *Id.* And at least one other court of appeals embraced the *Interfaith* court's conclusion that endangerments to the environment may exist even in the absence of a living "population" of humans, animals, or plants. *See Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1021 (10th Cir. 2007).

The standard for finding that there may be an imminent and substantial endangerment to the environment "in and of itself" (i.e., in the absence of a living population) is underdeveloped. As a result, Tri-Realty's claim that the environment at College Arms "in and of itself" may be imminently and substantially endangered leads to a difficult and, as of yet undiscussed, question: what does it mean to endanger something that is not alive? To "endanger" means to "put

---

delayed the remediation of its property and contributed to the existing site conditions." (Def.'s RCRA Reply Br. 12). But the Court will not grant summary judgment on these grounds for two reasons. First, the Court declines to address the argument because it was raised for the first time in a reply brief. *See United States v. Martin*, 454 F. Supp. 2d 278, 281 n.3 (E.D. Pa. 2006). Second, Ursinus presents no evidence to substantiate its claim that the contamination in Bum Hollow "could now be gone" if Tri-Realty had permitted Ursinus to take remedial measures sooner. (Def.'s RCRA Reply Br. 12). The Court cannot grant summary judgment in favor of Ursinus where Ursinus has presented no evidence to establish that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c)(1). Of course, Ursinus remains able to argue at trial the import of Tri-Realty's conduct.

(someone or something) at risk or in danger." *The New Oxford American Dictionary* 557 (2d ed. 2005). "Danger" is "the possibility of suffering harm or injury." *Id.* at 428. In reference to a living population, the notion of an imminent and substantial endangerment is rather straightforward: if there is a serious risk that the living population may become ill or die, the living population may be said to be facing an imminent and substantial endangerment. However, in reference to non-living elements of the environment such as soil or water, it is much more difficult to say what may pose an imminent and substantial endangerment.

Courts in the Third Circuit applying *Interfaith* have largely ignored the question of what may constitute an endangerment to the environment in and of itself. For example, in *Leese*, the district court granted summary judgment in favor of defendants despite "the recorded presence of TCE and PCE on Plaintiffs' properties" because "[p]roof of the mere detection of some measurable amount of hazardous materials on a property is not enough to maintain a RCRA claim." 2014 WL 3925510, at *11. But the district court did not explain why the TCE and PCE detected on the plaintiff's property did not mean that the environment itself was in danger. Indeed, the *Leese* court is not alone in finding, without reference to the "in and of itself" language from *Interfaith*, that hazardous materials in the environment may *not* present an imminent and substantial endangerment to the environment. *See Two Rivers Terminal, L.P. v. Chevron USA, Inc.*, 96 F. Supp. 2d 432 (M.D. Pa. 2000); *City of Fresno v. United States*, 709 F. Supp. 2d 934, 943 (E.D. Cal. 2010).

The Court can interpret the Third Circuit Court of Appeals' statement in *Interfaith* regarding the endangerment of water "in and of itself" in one of two ways. Under the stricter interpretation, an endangerment to the environment may exist whenever there is a risk that the

environment will be altered negatively[37] by the presence of a pollutant. In other words, RCRA would operate to preserve the existing state of nature, and any contamination that alters it constitutes a *per se* violation of RCRA. For example, imagine that a freshwater lake supports no living population and contains an extremely low level of dissolved salts. If salt spills into the water so that it has a higher level of dissolved salts, but remains a freshwater lake because it still has a low level of dissolved salts, the stricter interpretation of *Interfaith* would find that the lake has suffered harm "in and of itself" because its water is less pure than it once was. Other courts have interpreted *Interfaith* as standing for the proposition that "actual groundwater contamination essentially constitutes a *per se* endangerment to the environment under RCRA." *United States v. Apex Oil Co., Inc.*, 2008 WL 2945402, at *80 (S.D. Ill. July 28, 2008); *see PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 618 (7th Cir. 1998); *United States v. Hill*, No. 95-1716, 1998 WL 278291, at *4 (N.D.N.Y. May 20, 1998); *but see Tilot Oil, LLC v. BP Prods. N. Amer., Inc.*, 907 F. Supp. 2d 955, 968 (E.D. Wis. 2012) (limiting the finding of *per se* endangerment to cases where there has been no effort to abate the contamination).

The Court declines to adopt this stricter interpretation of *Interfaith* for several reasons. First, RCRA's text does not support finding a violation for trivial discharges. For example, RCRA liability exists when waste "may present an imminent and *substantial* endangerment" to the environment. 42 U.S.C. § 6972(a)(1)(B). To hold that any amount of pollution that impairs the purity or natural state of some element of the environment *endangers* the environment would be to render the word "substantial" superfluous, as practically *any* addition of a pollutant into the environment would give rise to liability. Second, the facts of *Interfaith* do not support finding a violation for trivial discharges. Although the language from *Interfaith* may be read to suggest

---

[37] This, of course, begs the further question of what constitutes a "negative" change. Without venturing into that metaphysical morass, for present purposes the Court will limit the inquiry to simply whether there is an "alteration."

that any environmental degradation, no matter how small, may constitute an endangerment "in and of itself," the actual endangerment in *Interfaith* was based on massive pollution that the parties agreed was extremely dangerous to living populations. *See* 399 F.3d at 263. Thus, the Court of Appeals has not suggested that there may be a RCRA violation in a case involving minor pollution or where the environment is not "highly contaminated." *Id.*; *cf. W.R. Grace & Co.*, 261 F.3d at 339-40. Finally, the structure of RCRA does not support the stricter interpretation of *Interfaith*. In the context of finding that RCRA did not permit private parties to recover for past cleanup efforts, the Supreme Court explained that RCRA would be "a wholly irrational mechanism" if it were intended to address the most minor environmental problems. *Meghrig*, 516 U.S. at 486-87. This conclusion follows from the fact that a private party may not bring suit under RCRA without first giving notice to the EPA, to the state, and to potential defendants, and from the fact that a private party cannot maintain a suit under RCRA if either the EPA or state authorities are diligently prosecuting a separate enforcement action. *Id.* Otherwise, as the Supreme Court explained, "[t]hose parties with insubstantial problems, problems that neither the State nor the Federal Government feel compelled to address, could recover their response costs, whereas those parties whose waste problems were sufficiently severe as to attract the attention of Government officials would be left without a recovery." *Id.* The stricter interpretation of *Interfaith* would therefore be inconsistent with the Supreme Court's observation about the limited scope of RCRA liability.

Instead, the Court adopts a more functional interpretation of *Interfaith* and concludes that an imminent and substantial endangerment to the environment in and of itself may exist if contamination threatens the ability of a non-living element of the environment to serve some potential function in the local ecosystem. The Court's analysis proceeds in two stages. First, the

Court considers what potential purpose the non-living element of the environment could serve in the local ecosystem. Importantly, because endangerments may exist in the absence of a living population, the Court need not find that the non-living element of the environment is actually serving its potential purpose in the local ecosystem. Second, the Court considers whether the alleged contamination impairs the ability of that non-living element of the environment to serve that potential purpose in the local ecosystem. Returning to the example of the salt added to the freshwater lake, under the functional interpretation of *Interfaith*, an imminent and substantial endangerment to the lake in and of itself may exist if there is some potential purpose that freshwater might serve in the local ecosystem that the freshwater from the lake can no longer serve due to the additional salt. For example, if the original freshwater from the lake could potentially support the growth of certain plants in the local ecosystem, then the addition of salt to the lake may present an imminent and substantial endangerment to the lake in and of itself if the additional salt impairs the ability of the lake's freshwater to support the growth of those plants.

As another useful example of the functional interpretation of *Interfaith*, consider a segment of soil in a clearing in a forest. Assume that no animals live on the soil, and, although the soil is capable of supporting the growth of plants, no plants *actually* grow in that soil. Now, imagine that there is a spill of toxic waste on that segment of soil. Under the functional interpretation of *Interfaith*, the spill may constitute an endangerment to the environment in and of itself, not because the environment is less pristine than it was before the spill, but rather because the soil—which had the potential to support the growth of certain plants that thrive in the local ecosystem—may no longer capable of serving that function by virtue of the spill. In other words, the soil is in danger because it may no longer be able serve a particular potential purpose, even though it did not actually serve that purpose at the time of the spill.

The Court adopts the functional interpretation of *Interfaith* for several reasons. First, in the same way that the stricter interpretation of *Interfaith* was *inconsistent* with the RCRA statute, the functional interpretation of *Interfaith* is consistent with the language of the RCRA statute and does not render superfluous an essential word of the statute. Second, the functional interpretation of *Interfaith* is consistent with the Supreme Court's characterization of the RCRA statute in *Meghrig*, in that it limits RCRA's applicability to non-trivial environmental problems. Finally, the functional interpretation of *Interfaith* is more consistent with RCRA's purposes than is the stricter interpretation of *Interfaith*. Although strict environmental preservation is certainly an objective consistent with RCRA, Congress intended RCRA to be a practical solution to serious environmental problems, not a statute that authorizes citizen suits for trivial instances of pollution. Thus, RCRA's purpose is "to promote the protection of health and the environment," not to *guarantee* the protection of health and the environment. *Id.* § 6902(a). RCRA does not make it the policy of the United States that the generation of hazardous waste be prohibited, but rather that, "*wherever feasible*, the generation of hazardous waste is to be reduced or eliminated as expeditiously as possible." *Id.* § 6902(b) (emphasis added). RCRA does not make it the policy of the United States that waste be handled so as to eliminate altogether the threat of harm to the environment, but rather that waste be handled "so as to *minimize* the present and future threat to human health and the environment." *Id.* (emphasis added).

Under the relevant legal standard as articulated above, the Court finds that Tri-Realty has introduced sufficient evidence to survive summary judgment on the issue of an endangerment to the environment in and of itself. For example, there is evidence that the First and Second Seeps would be freshwater springs in the absence of any pollutant, but both are presently contaminated with No. 6 oil. (Pl.'s RCRA Br. 36). A sample of the water discharging from the First Seep into

the Impoundment, and from there into the Spillway, contained 2.0 ppb of chrysene and the Pennsylvania health standard for dissolved chrysene in surface water is .0038 ppb. Thus, before the spill, water in Bum Hollow could potentially be used for safe drinking; after the spill, water in Bum Hollow may be incapable of use for safe drinking. So even though there is no evidence that the water is actually used for drinking, there is evidence to suggest that the water in Bum Hollow is endangered in and of itself.

Ursinus's arguments to the contrary are unpersuasive. First, the fact that the water at College Arms does not support aquatic life and is not used for drinking by humans is not enough to justify summary judgment because the *Interfaith* court specifically rejected the notion that a living population was required to find RCRA liability. *See* 399 F.3d at 263. Second, although Ursinus points to evidence that many of the tests at College Arms failed to detect pollutants, those tests are a matter of dispute because Tri-Realty claims that some of those tests were unable to detect pollution of the types and in the amounts present at College Arms and that pollution in those amounts may present a substantial and imminent endangerment. (*See* Pl.'s Ex. 118 at 60:1-61:5; Pl.'s Ex. 87). Third, Ursinus argues that the situation at College Arms is not nearly as dangerous as the situation in *Interfaith*, but the situation in *Interfaith* is just one example of circumstances giving rise to RCRA liability. The situation in *Interfaith* is not the least dangerous situation that may present an imminent and substantial endangerment under RCRA. The Court agrees that there certainly appears to be a *less* substantial endangerment at College Arms than at the contaminated site in *Interfaith*, but it may nevertheless be actionable under RCRA. Fourth, Ursinus argues that there is insufficient evidence connecting the chrysene at College Arms to the No. 6 fuel oil that escaped from the Ursinus USTs because chrysene is ubiquitous and there are other sources of chrysene in Bum Hollow. At the very least, whether or not the chrysene at

College Arms came from the Ursinus USTs is a disputed issue of material fact precluding summary judgment because Tri-Realty's experts have opined that the chrysene detected came from Ursinus's No. 6 oil and *not* from alternative sources such as storm water runoff. (*See* Pl.'s Ex. 98 at 6). The expert opinion, along with the evidence on which it is based, will permit Tri-Realty to survive summary judgment. Thus, although Ursinus certainly has demonstrated that there are potential flaws in Tri-Realty's case, flaws that may well defeat Tri-Realty, those potential flaws are matters for the factfinder and not for summary judgment.[38]

## C.   CLEAN WATER ACT

The CWA prohibits "the discharge of any pollutant by any person" unless the discharge complies with various statutory requirements and occurs pursuant to the terms of a valid National Pollutant Discharge Elimination System ("NPDES") permit. *See* 33 U.S.C. §§ 1311, 1342. The CWA defines "discharge of any pollutant" as "any addition of any pollutant to navigable waters from any point source." *Id.* § 1362(12). To establish liability under the CWA, Tri-Realty must prove that Ursinus "(1) discharged, *i.e.,* added (2) a pollutant (3) to navigable waters (4) from a point source (5) without [an NPDES] permit." *Reynolds v. Rick's Mushroom Serv., Inc.*, 246 F. Supp. 2d 449, 454 (E.D. Pa. 2003). The parties agree that No. 6 oil is a pollutant and that Ursinus lacks a permit to discharge No. 6 oil, but the other three elements of CWA liability are matters of dispute. The Court will address each of these elements in turn, namely: (1) the existence of a

---

[38] Although the Court denies summary judgment in favor of Ursinus on the issue of endangerment to the environment, Tri-Realty will bear the burden of proof at trial. In order to demonstrate the threat of an endangerment to the environment in and of itself, Tri-Realty will have to prove, among other things, that (a) the chemicals detected warrant RCRA liability under the standard articulated above, and (b) the chrysene on the College Arms Property is from No. 6 oil that escaped the Ursinus USTs. The result at this stage of the litigation in no way limits or lightens the burden of proof on Tri-Realty or constitutes a finding that Tri-Realty has proven its case.

point source; (2) the existence of navigable waters; and (3) the addition of a pollutant to navigable waters from a point source.

           1.        Point Source

The CWA defines a "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). "Congress intended a broad definition of 'point source:' '[t]he concept of a point source was designed to further [the CWA's regulatory] scheme by embracing the broadest possible definition of any identifiable conveyance from which pollutants might enter the waters of the United States." *W. Indies Transp., Inc.*, 127 F.3d at 309 (quoting *United States v. Earth Sciences, Inc.*, 599 F.2d 368, 373 (10th Cir. 1979)). At the same time, there is an outer limit to what may constitute a "point source." For example, "[a] discharge of pollutants into navigable waters occurring only through migration of groundwater and uncontrolled soil runoff represents 'nonpoint source' pollution" and is outside the scope of the CWA. (Mem. Op. 13, Nov. 21, 2013, ECF No. 48).

Ursinus moves for summary judgment and argues that, as a matter of law, there are no point sources discharging pollution in this case. Tri-Realty responds that there are four point sources: (a) the Impoundment, (b) the Spillway, (c) the Hillside Pipe, and (d) the Drainage Swale. For the reasons that follow, the Court finds that Tri-Realty has presented sufficient evidence from which a reasonable factfinder could conclude that one or more of those features may be point sources.

a.      The Impoundment and the Spillway

The evidence in the record may be sufficient to prove that the Impoundment and/or the Spillway are point sources under the CWA. The Impoundment and the Spillway are man-made conveyances that collect and direct the mixture of oil and groundwater expressing at the First Seep. Ursinus built the Impoundment to capture and contain pollutants emerging from the First Seep and to prevent oil and oil-contaminated water from reaching the Drainage Swale and Bum Hollow Run. In response to the risk that oil and oil-contaminated would overflow from the Impoundment and escape uncontrolled into the environment, Ursinus built the Spillway. The Spillway is intended to control and limit the escape of oil and oil-contaminated water from the Impoundment by capturing pollutants and releasing non-pollutant fluids into the Lower Drainage Swale. To the extent those conveyances fail and pollution discharges from them into navigable waters, they may be point sources under the CWA. *See, e.g.*, *Shellfish Growers*, 278 F. Supp. 2d at 679-80 (finding several dams and sediment traps, "constructed in an effort to reduce the discharge of pollutants," to be point sources); *Reynolds*, 246 F. Supp. 2d at 457 (finding that a system "designed to prevent the discharge of pollutants" may be a "point source" if it breaks down and results in a discharge of pollutants into navigable waters); *Earth Sciences*, 599 F.2d at 374 (finding that a "closed circulating system" may be a point source when it fails and liquid escapes).

Although oil reaches the Impoundment (and ultimately the Spillway) through diffuse groundwater migration, which the Court has held to be nonpoint source pollution, the Impoundment and the Spillway may nevertheless be point sources because they are discernible conveyances from which pollutants are or may be discharged. Ursinus interprets the Court's Memorandum Opinion denying Ursinus's motion to dismiss the CWA claim to mean that

pollution spreading through diffuse groundwater migration is nonpoint source pollution and cannot become point source pollution by virtue of being collected or channeled in the Impoundment and/or the Spillway. But whether the Impoundment and/or the Spillway constitute point sources will not turn on how the oil allegedly *reaches* them, but whether the oil was "*collected or channeled by man*" within the Impoundment and/or the Spillway such that pollution escaping from them "constitutes point source pollution within the meaning of the statute." (Mem. Op. 13, Nov. 21, 2013, ECF No. 48 (emphasis added)). Indeed, as the Court explained in its Memorandum Opinion, "a discharge of pollutants into navigable waters occurring *only* through migration of groundwater and uncontrolled soil runoff represents 'nonpoint source' pollution." *Id.* at *8 (emphasis added). A discharge of pollutants that begins through groundwater migration and is later "collected or channeled by man" may constitute point source pollution. Tri-Realty has introduced evidence that the discharge of pollutants in this case occurred through the migration of groundwater *that was then confined in the Impoundment and released from the Impoundment via the Spillway*. A reasonable factfinder may conclude from that evidence that the Impoundment and/or the Spillway are point sources, so summary judgment is not warranted on that issue.

Ursinus argues that mechanisms designed to remediate pollution can only be point sources when they collect "channeled surface pollutants and/or contaminated stormwater runoff," (Def.'s CWA Reply Br. 3), and that it was clearly not the purpose of the CWA to expose a party remediating previously contaminated groundwater to liability. The Court disagrees. First, the Court sees no material difference between channeled surface pollutants, contaminated stormwater runoff, and the oil and oil-water mixture expressing into the Impoundment and the Spillway from the First Seep. Although Tri-Realty relies on cases involving mechanisms that

collected channeled surface pollutants and/or contaminated stormwater runoff, Ursinus gives no principled reason why the holdings of those cases should be limited to those types of pollutants or should not apply with equal force to mechanisms intended to collect and remediate pollutants emerging from groundwater. Indeed, assuming *arguendo* that remedial mechanisms may be point sources only if they collect channeled surface pollutants and/or contaminated stormwater runoff, the Impoundment and the Spillway could still qualify as point sources: although oil and oil-contaminated water reach the First Seep through diffuse groundwater migration, the Impoundment and the Spillway channel those pollutants only *as they express on the surface of Bum Hollow*. As a result, the Court rejects Ursinus's distinction without a difference and, in any event, finds that the Impoundment and the Spillway could be point sources even under Ursinus's theory.

Second, although the Court's holding suggests that a party who takes action to remediate previously contaminated groundwater in the vicinity of navigable waters may create a potential point source that did not previously exist, Ursinus's assertion—without any citation—that this was clearly not the purpose or intention of the CWA cannot be correct. Under Ursinus's approach, parties that remediate previously contaminated groundwater would be immune from CWA liability for no discernible reason, even if their actions perhaps exacerbate the problem by introducing contamination from other areas of the environment to previously uncontaminated "navigable waters." The Impoundment and the Spillway were constructed for a remedial purpose, but they are nevertheless conveyances built to capture and channel pollution. If they fail to function as intended and facilitate the addition of pollutants to navigable waters, CWA liability may result. Under the facts of this case, the Impoundment and the Spillway may

constitute point sources capable of rendering Ursinus liable for CWA violations, even if the discharged pollution was originally extracted from some portion of the environment.[39]

        b.      Hillside Pipe and Drainage Swale

Tri-Realty has also presented sufficient evidence from which a reasonable factfinder could conclude that the Hillside Pipe and the Drainage Swale are point sources. The Hillside Pipe and the Drainage Swale are discernible, confined, and discrete conveyances that the evidence suggests might carry oil and oil-contaminated water to navigable waters. Aside from the fact that the CWA defines the term "point source" to include any "pipe," "channel," and "ditch"—and the record evidence shows that many have used those and similar words to describe the Hillside Pipe and the Drainage Swale, (*see, e.g.*, Pl.'s Ex. 80 at 6-7 (referring to the Drainage Swale as a "channel"))—"[t]he essence of a point source discharge is that it be from a 'discernible, confined, and discrete conveyance.'" *O'Leary*, 523 F. Supp. at 655 (quoting 33 U.S.C. § 1362(14)); *see PennEnvironment v. PPG Indus., Inc.*, 964 F. Supp. 2d 429, 454-55 (W.D. Pa. 2013). Indeed, as the Court explained in its Memorandum Opinion addressing Ursinus's motion to dismiss, "Accepting as true Tri-Realty's allegations that pollutants have reached Bum Hollow Run and the navigable waters of Perkiomen Creek via stormwater runoff collected and channeled through the 'Stormwater Pipe' and the 'Drainageway,' the Court must accept that Tri-Realty has adequately alleged the addition of a pollutant to 'navigable waters' from a 'point source' and can avoid dismissal of that claim at this juncture." (Mem. Op. 13-14, Nov. 21, 2013, ECF No. 48). Now, with respect to summary judgment, there is some evidence in the record to substantiate those allegations. (*See, e.g.*, Pl.'s Ex. 33 (appearing to show oil-

---

[39] Just because the Impoundment and the Spillway may be point sources based on alleged discharges of pollutants from one part of the environment (i.e., surfacing groundwater) to another part of the environment (i.e., navigable waters) does not necessarily mean that there is sufficient evidence to find liability.

contaminated groundwater entering the Hillside Pipe); Pl.'s Ex. 97 at 13). Consequently, the Hillside Pipe and the Drainage Swale may be point sources under the CWA and summary judgment on that issue is inappropriate.

Ursinus argues that the Hillside Pipe and the Drainage Swale cannot be point sources because Tri-Realty has no evidence that pollutants were directly channeled into them. According to Ursinus, "a man-made or a natural channel . . . is only a point source when it conveys pollutants which are directly channeled into it." (Ursinus CWA Reply Br. 5). But Ursinus ignores the fact that nonpoint source pollution can become point source pollution once it is "collected or channeled by man." (Mem. Op. 14, Nov. 21, 2013, ECF No. 48; *see id.* ("A discharge of pollutants into navigable waters occurring *only* through migration of groundwater and uncontrolled soil runoff represents 'nonpoint source' pollution." (emphasis added)). In other words, a discharge of pollutants into navigable waters occurring not only through migration of groundwater or uncontrolled soil runoff, but through migration of groundwater or soil runoff that is then channeled and directed, *may* constitute point source pollution. *See, e.g.*, *Earth Sciences*, 599 F.2d at 374 (finding that excess fluid escaping a closed industrial system is point source pollution, even though "the source of the excess liquid is rainfall or snow melt"); *Sierra Club v. Abston Constr. Co., Inc.*, 620 F.2d 41, 47 (5th Cir. 1980) ("Although the point source definition excludes unchanneled and uncollected surface waters, surface runoff from rainfall, when collected or channeled by [man], constitutes point source pollution." (internal citations and quotation marks omitted)). Thus, a party may be liable under the CWA even if pollutants are not *directly* channeled to point sources.[40] Moreover, just as the Supreme Court found persuasive the

---

[40] Furthermore, the concept of point source pollution "has nothing to do with the intent of the operators or the reasonableness of the existing collection system," *O'Leary*, 523 F. Supp. at 655, so it follows that the Hillside Pipe and the Drainage Swale may be point sources once oil

fact that the CWA "does not forbid 'the addition of any pollutant *directly to* navigable waters from any point source,' but rather the 'addition of any pollutant *to* navigable waters,'" *Rapanos v. united States*, 547 U.S. 715, 743 (2006) (quoting 33 U.S.C. § 1362(12)(A)) (emphasis in original), so too does this Court find persuasive the fact that the CWA does not define the term "point source" to mean "any discernible, confined and discrete conveyance *to which pollutants are directly channeled* and from which pollutants are or may be discharged," but rather as "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). The text of the CWA suggests only that a party may be liable due to the "addition of any pollutant to navigable waters from any point source," *id.* § 1362(12), not due to the "addition of any pollutant to navigable waters from any point source *that directly receives pollutants*."

The cases Ursinus cites in support of its argument are not persuasive. In *Dague v. City of Burlington*, 935 F.2d 1343 (2d Cir. 1991), leachate escaped from a landfill and flowed "into Beaver Pond and thence through [a] culvert under [a] railroad embankment and into" a wetland. *Id.* at 1347. Even though the pollutant entered the wetland only after passing through Beaver Pond and a culvert, the Second Circuit Court of Appeals found that the culvert was a point source because it conveyed pollutants from Beaver Pond into the wetland. *Id.* at 1355. Just as the culvert was capable of being a point source because pollution from Beaver Pond migrated through it into the wetland, so too are the Hillside Pipe and Drainage Swale capable of being point sources because polluted groundwater allegedly migrates through them into the allegedly navigable waters of Bum Hollow Run. Similarly, in *Aiello v. Town of Brookhaven*, 136 F. Supp. 2d 81 (E.D.N.Y. 2001), plaintiffs alleged that a landfill contaminated a nearby creek and pond.

and/or oil-contaminated water are collected or channeled, whether or not they were added directly or indirectly, intentionally or unintentionally.

*Id.* at 84. The district court found that culverts, located on the north and south ends of the pond, were point sources under *Dague* because water flowed through them into the pond. *Id.* at 118-19. In this case, the Hillside Pipe and the Drainage Swale are likewise point sources because pollutants allegedly flow through them into navigable waters. Neither *Dague* nor *Aiello* persuade this Court to limit the definition of "point source" to conveyances into which pollutants are directly channeled.

2.    Navigable Waters

The CWA defines the term "navigable waters" to mean "the waters of the United States, including the territorial seas." *Id.* § 1362(7). Regulations adopted by the U.S. Army Corps of Engineers pursuant to the CWA interpret the phrase "the waters of the United States" broadly, so that they include not only those waters which are navigable-in-fact, but also:

> (1) All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;
> (2) All interstate waters, including interstate wetlands;
> (3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:
>> (i) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or
>> (ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or
>> (iii) Which are used or could be used for industrial purpose by industries in interstate commerce;
> (4) All impoundments of waters otherwise defined as waters of the United States under the definition;
> (5) Tributaries of waters identified in paragraphs (a)(1) through (4) of this section;
> (6) The territorial seas; and
> (7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a)(1) through (6) of this definition.

33 C.F.R. § 328.3(a). In this case, it is undisputed that the Perkiomen Creek is navigable-in-fact and thus one of the waters of the United States. Therefore, under the Corps' regulation,

67

tributaries of the Perkiomen Creek and wetlands "adjacent to" the Perkiomen Creek or its tributaries are among "the waters of the United States" subject to the CWA.

Ursinus argues that the undisputed evidence in the record demonstrates that there are no navigable waters on the College Arms Property, but Tri-Realty claims that the following three physical features of Bum Hollow qualify as navigable waters for the following reasons: (1) Bum Hollow Run, because it is both a tributary of the Perkiomen Creek and a water of the United States in its own right; (2) the Lower Drainage Swale, because it is both a tributary of Bum Hollow Run and a water of the United States in its own right; and (3) the portion of Bum Hollow in which the Impoundment is located, because it is a wetland subject to the CWA. For the reasons that follow, the Court finds that neither Bum Hollow Run nor the Lower Drainage Swale is among the waters of the United States in its own right, but that there are disputed issues of material fact regarding whether Bum Hollow Run and the Lower Drainage Swale are tributaries of the Perkiomen Creek. Therefore, the Court cannot grant summary judgment as to those alleged navigable waters. The Court will not address whether the alleged wetlands in Bum Hollow are subject to the CWA because Tri-Realty's CWA claim based on the alleged wetlands fails for other reasons discussed later. *See infra* Part III.C.3.

           a.       The Waters of the United States in Their Own Right

Both Tri-Realty and Ursinus rely on *Rapanos v. United States*, 547 U.S. 715 (2006), to argue that Bum Hollow Run and the Lower Drainage Swale either are or are not "waters of the United States" in their own rights. In *Rapanos*, the Supreme Court considered whether the Corps' expansive definition of "the waters of the United States," quoted above, was a permissible interpretation of the phrase. Justice Scalia, writing for the four-Justice plurality, found that, in light of "[t]he only natural definition of the term 'waters,' our prior and subsequent

68

judicial constructions of it, clear evidence from other provisions of the statute, and this Court's canons of construction," the phrase "the waters of the United States" in the CWA "cannot bear the expansive meaning that the Corps would give it." *Id.* at 731-32. Noting Congress's use of the definite article ("the") and the plural ("waters"), the plurality found that the CWA does not refer to water in general, but rather "refers more narrowly to water '[a]s found in streams and bodies forming geographical features such as oceans, rivers, [and] lakes,' or 'the flowing or moving masses, as of waves or floods, making up such streams or bodies.'" *Id.* at 732 (quoting *Webster's New International Dictionary* 2882 (2d ed. 1954)). The plurality concluded:

> In sum, on its only plausible interpretation, the phrase 'the waters of the United States' includes only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams[,] . . . oceans, rivers, [and] lakes. The phrase does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall."

*Id.* at 739 (internal citations omitted). The plurality was careful to note that usually dry channels are never "streams," *id.* 733 n.6, but "streams, rivers, or lakes that might dry up in extraordinary circumstances, such as drought" and "*seasonal* rivers, which contain continuous flow during some months of the year but no flow during dry months," may be "relatively permanent" and qualify as one of "the waters of the United States." *Id.* at 733 n.5 (emphasis in original). In contrast, "intermittent and ephemeral streams," meaning "streams whose flow is coming and going at intervals . . . broken, fitful, or existing only, or no longer than, a day; diurnal . . . short-lived," are not covered by the CWA. *Id.* (internal quotation marks and citations omitted).

In a concurrence, Justice Kennedy concluded that "absent a significant nexus" between a given geographical feature and a body of water that is navigable in fact, "jurisdiction under the Act is lacking." *Id.* at 767. According to Justice Kennedy, a "significant nexus" is properly understood in light of the purpose of the CWA, which is to "restore and maintain the chemical,

physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). As a result, bodies of water possess the requisite nexus—and thus comes within the definition of "navigable waters"—if they "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.' When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'" *Id.* at 780.

In the Third Circuit, geographical features may qualify as waters of the United States only if they satisfy either the plurality's standard or Justice Kennedy's standard. *See United States v. Donovan*, 661 F.3d 174, 180 (3d Cir. 2011). Consequently, in this case, a geographical feature may qualify as a navigable water only if it either (a) is a relatively permanent body of water that, in ordinary parlance, may be described as a stream, ocean, river, or lake, or (b) significantly affects the chemical, physical, and biological integrity of other covered waters more readily understood as navigable.

The parties dispute whether Bum Hollow Run or the Lower Drainage Swale is among the waters of the United States in its own right by virtue of satisfying or not satisfying at least one of the applicable legal standards from *Rapanos*. However, the Court finds that both parties misinterpret that Supreme Court decision and neither Bum Hollow Run nor the Lower Drainage Swale is among the waters of the United States in its own right. A geographical feature is a water of the United States "in its own right" if and only if it satisfies one of the standards from the Corps' regulation defining the phrase "the waters of the United States." In *Rapanos*, the plurality and Justice Kennedy decided only whether the Corps' regulation defining the phrase "the waters of the United States" was impermissibly broad. They did *not* create an alternative test, separate

and apart from the Corps' regulation, for identifying jurisdictional waters. For example, the plurality explained that "navigable waters" may not be intermittent or ephemeral, and Justice Kennedy explained that "navigable waters" must have a substantial nexus with a body of water that is navigable in fact or reasonably capable of being made so. Those conditions are necessary, but not sufficient, to find that a given body of water qualifies as "navigable waters" subject to the CWA. Indeed, *Rapanos* uses the phrase "waters of the United States in their own right" only to describe waters that are navigable in fact or reasonably capable of being made navigable in fact. *See* 547 U.S. at 742. In other words, the applicable opinions from *Rapanos* stand for the proposition that, under some circumstances, a geographical feature satisfying the Corps' regulation defining "the waters of the United States" could nevertheless *not* be "navigable waters" subject to the CWA.

Because the Supreme Court's decision in *Rapanos* did *not* establish a legal standard, separate and apart from the Corps' regulation, for identifying "the waters of the United States," whether or not something is among "the waters of the United States" in its own right remains a question decided primarily under the Corps' regulation. The Court is unaware of any decision by any court finding that a geographical feature that satisfies the legal standards articulated by either the plurality or Justice Kennedy in *Rapanos* is covered by the CWA without satisfying the Corps' regulation. Thus, to be a water of the United States *in its own right* (i.e., not a tributary feeding a water of the United States in its own right or a wetland adjacent to a water of the United States in its own right), a geographical feature must be navigable in fact, reasonably capable of being made navigable in fact, or satisfy one of the definitions in the Corps' regulation. The mere fact that a geographical feature may satisfy the legal standards articulated by the

plurality and Justice Kennedy in *Rapanos* is not enough, in and of itself, to qualify as a water of the United States under the CWA.

Apart from evidence that Bum Hollow Run and the Lower Drainage Swale are arguably tributaries of the Perkiomen Creek, Tri-Realty has presented no evidence to suggest that Bum Hollow Run or the Lower Drainage Swale meet the Corps' standards for delineating "the waters of the United States." There is no evidence that Bum Hollow Run and/or the Lower Drainage Swale are or were the territorial seas, interstate waters, intrastate waters whose degradation might affect interstate or foreign commerce, waters subject to the ebb and flow of the tides, or waters that are home to fish or shellfish that are or could be sold in interstate or foreign commerce. Nor is there evidence that they are or were waters used or susceptible to being used in interstate or foreign commerce, by interstate or foreign travelers for recreational or other purposes, or for industrial purposes by industries in interstate commerce. Consequently, the Court will grant summary judgment in favor of Ursinus as to Tri-Realty's claim that Bum Hollow Run and the Lower Drainage Swale are navigable waters in their own right.

b.     Tributaries of Navigable Waters

A tributary is "a river or stream flowing into a larger river or lake." *The New Oxford American Dictionary* 1798 (2d ed. 2005). The Corps considers a geographical feature to be a tributary if it feeds into traditional navigable waters (or a tributary thereof) and possesses an "ordinary high water mark." 33 C.F.R. § 328.4(c). An ordinary high-water mark is a "line on the shore established by the fluctuations of water and indicated by physical characteristics such as a clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means that consider the characteristics of the surrounding areas." *Id.* §§ 328.3(e), 328.4(c). A tributary

72

feeding a water of the United States is itself a water of the United States under the CWA, so long

as it satisfies one of the standards outlined by the plurality or Justice Kennedy in *Rapanos*. *See*

*supra* Part III.C.2.a.

Although much of the evidence is disputed, Tri-Realty has presented sufficient evidence

from which a reasonable factfinder could conclude that Bum Hollow Run is a tributary feeding

into the Perkiomen Creek. For example, the record shows that dye placed into the visible flow of

Bum Hollow Run at College Arms and to the west of Route 29 emerged on the east side of Route

29 at the point where Bum Hollow Run supposedly meets with the Perkiomen Creek.[41] (*See* Pl.'s

Ex. 80 at 19-20). Although Ursinus does not dispute the results of the dye test or the existence of

a connection between the water in Bum Hollow Run and the Perkiomen Creek, it does dispute

the "nature and extent of the connection" between Bum Hollow Run and the Perkiomen Creek.

(Def.'s CWA Reply Br. 7). Ursinus argues that water from Bum Hollow Run "pools in the

detention basin and either enters a perforated pipe or recharges into the ground as groundwater"

before reaching Perkiomen Creek. (Def.'s CWA Reply Br. 7). The "nature and extent of the

connection" between Bum Hollow Run and Perkiomen Creek are facts critical to determining

whether Bum Hollow Run is a tributary of a water of the United States and, by extension,

whether the Lower Drainage Swale (which feeds into Bum Hollow Run) is a tributary of a water

of the United States. Consequently, that dispute must be decided at trial and summary judgment

on the tributary issue is unwarranted.

---

[41] In addition to the dye test, Tri-Realty relies on contemporaneous news reports from 1968 that oil from a spill at College Arms reached the Perkiomen Creek. (Pl.'s Ex. 38 app. A at 2). Standing alone, this evidence might well not be enough to survive summary judgment. However, in combination with the dye test and other evidence in the record, it serves as evidence from which a reasonable factfinder might conclude that Bum Hollow Run is a tributary of the Perkiomen Creek.

Ursinus argues that Bum Hollow Run is not a tributary subject to the CWA because it (1) lacks "a surface water connection to the Perkiomen Creek as required by the plurality in *Rapanos*," (Def.'s CWA Br. 38), and (2) "is intermittent and only the upper reaches of the stream have a relatively permanent flow," *id.*, thus failing the tests articulated in *Rapanos*. Ursinus is in error. First, assuming that Bum Hollow Run lacks a surface water connection to the Perkiomen Creek[42]—a fact that may be disputed—Ursinus misapplies the Supreme Court's decision in *Rapanos* because any requirement that there be a "surface water connection" relates to wetlands, not to tributaries. *See Rapanos*, 547 U.S. at 742 ("[O]nly those wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands, are 'adjacent to' such waters and covered by the Act." (emphasis omitted)). Indeed, as the *Rapanos* plurality derived the requirement for a surface water connection from the phrase "adjacent to," which the Corps' regulation uses only in reference to wetlands and not to tributaries, nothing in *Rapanos* requires that a *tributary* have a surface water connection in order to satisfy the Corps' regulation. *See id.*; 33 C.F.R. § 328.3(a)(7). Consequently, the Court cannot adopt Ursinus's argument on that point to find, as a matter of law, that Bum Hollow Run is not a tributary, meager thought it may be, of the Perkiomen Creek.[43]

---

[42] Ursinus claims that the stream channel disappears entirely more than 200 feet before it reaches Route 29 and water from Bum Hollow Run "only reaches the Perkiomen Creek through diffuse groundwater flow under typical conditions." (Def.'s CWA Br. 39).

[43] Even accepting *arguendo* Ursinus's characterization of the allegedly underground portion of Bum Hollow Run as "groundwater," it is not clear that Tri-Realty's CWA claim would fail as a result. Courts are split on the issue of whether tributary groundwater may constitute "navigable waters" under the CWA. *Compare, e.g.*, *Calif. Sportfishing Prtoection Alliance v. Diablo Grande, Inc.*, 209 F. Supp. 2d 1059, 1076 n.8 (E.D. Cal. 2002), *and Idaho Rural Council v. Bosma*, 143 F. Supp. 2d 1169, 1180 (D. Idaho 2001), *with Village of Oconomowoc Lake v. Dayton Hudson Corp.*, 24 F.3d 962 (7th Cir. 1994), *and Town of Norfolk v. U.S. Army Corps of Eng'rs*, 968 F.2d 1438, 1451 (1st Cir. 1992). Because there is a dispute as to whether the

Second, disputed issues of material fact prevent the Court from finding that, as a matter of law, Bum Hollow Run fails to meet either of the legal standards announced in *Rapanos*. With respect to the *Rapanos* plurality, whether or not Bum Hollow Run is made up of "relatively permanent waters" is a disputed issue of material fact, as Tri-Realty has presented evidence from which a reasonable factfinder could conclude that it is. Dr. Schmid opined that Bum Hollow Run contains "relatively permanent waters" that, although perhaps seasonal, constitute "navigable waters" under the CWA. (*See* Pl.'s Ex. 80 at 7, 19-21 ("The stream flow of Bum Hollow Run was judged to be relatively permanent. Although the stream may dry up during the late summer and autumn dry season, as many intermittent headwater streams do in southeastern Pennsylvania, photographs taken by representatives of Tri-Realty Company over the last eighteen months regularly show flowing water.")). Dr. Schmid also noted that Bum Hollow Run appears to exist in its own channel and, over the last few years, was observed flowing every month. (*See* Pl.'s Ex. 80 at 6-7, 17, app. C). With respect to Justice Kennedy's concurrence in *Rapanos*, there is evidence in the record suggesting that there is a substantial nexus between Bum Hollow Run and the Perkiomen Creek. For example, a reasonable finder of fact could conclude from the results of the dye test and reports that oil from a spill at College Arms in 1968 reached the Perkiomen Creek that Bum Hollow Run is capable of spreading environmental damage to the Perkiomen Creek. (*See* Pl.'s Ex. 38 at Exs. A, D). Therefore, questions of fact remain as to whether Bum Hollow Run may qualify as one of "the waters of the United States" under either of the applicable standards from *Rapanos*.

Ursinus also argues that the Lower Drainage Swale is not among "the waters of the United States" because (1) the Lower Drainage Swale is "a function of artificially re-directed

---

connection between Bum Hollow Run and the Perkiomen Creek is properly characterized as "groundwater," the Court need not decide this question at this stage of the litigation.

stormwater" rather than a "naturally-occurring" stream, (Def.'s CWA Reply Br. 9), and (2) the Lower Drainage Swale's possible effect on water quality in the Perkiomen Creek is "speculative or insubstantial," *id.* The Court finds that neither argument warrants summary judgment. First, Ursinus cites no cases to support the proposition that geographic features must be "naturally-occurring" in order to qualify as "navigable waters" under the CWA. Indeed, the Supreme Court characterized the relevant issue as whether a given geographic feature may be "described in ordinary parlance as [a] stream," *Rapanos*, 547 U.S. at 739 (internal quotation marks omitted), *not* whether it may be described in ordinary parlance as a "*naturally-occurring* stream." To the extent Ursinus might rely on the language from *Rapanos* requiring that waters of the United States be "geographical features," *see* 547 U.S. at 732-33, the Court notes that some geographical features are *not* naturally occurring, yet may qualify as "navigable waters" under the CWA. Indeed, numerous courts have concluded that artificial waterways may be jurisdictional waters under the CWA. *See, e.g.*, *United States v. Vierstra*, 803 F. Supp. 2d 1166, 1168 (D. Idaho 2011), *aff'd* 492 F. App'x 738 (9th Cir. 2012) (finding that a canal may constitute "waters of the United States" by virtue of being a tributary connected to a navigable waterway); *ONRC Action v. U.S. Bureau of Reclamation*, No. 97-3090, 2012 WL 3526833, at *23 (D. Or. Jan. 17, 2012) (same). Moreover, even if the distinction between natural and artificial geographic features were legally relevant, whether the Lower Drainage Swale is "naturally-occurring" or artificial appears to be a disputed issue of material fact. (*Compare* Pl.'s Ex. 58 at 34-35 (noting that the Drainage Swale is "naturally-occurring"), *with* Def.'s CWA Ex. 17 at 9-10 (noting that the Drainage Swale would not exist but for the man-made Stormwater Pipe)).

Second, a reasonable factfinder may find that a substantial nexus exists between the Lower Drainage Swale and Bum Hollow Run (and, by extension, the Perkiomen Creek) based on Dr. Schmid's expert report. Dr. Schmid explains that oil and oil-contaminated water is discharging into the Lower Drainage Swale from the Hillside Pipe and/or the Spillway, and cites evidence suggesting that components of No. 6 fuel oil have reached the Lower Drainage Swale and Bum Hollow Run. (*See* Pl.'s Ex. 57 at 176:4-12; Pl.'s Ex. 80 at 10, 56; Pl.'s Ex. 97 at 4, 7, 11-13; Def.'s RCRA Ex. 61 at 65:1-2). This evidence suggests that pollution entering the Lower Drainage Swale is capable of damaging Bum Hollow Run and/or the Perkiomen Creek, thereby demonstrating that a substantial nexus exists between them. Therefore, even under Justice Kennedy's concurrence, there remains a triable issue of fact as to whether the Lower Drainage Swale may constitute "waters of the United States."

Because Ursinus has not demonstrated the undisputed material facts favor summary judgment on the grounds that there are no "navigable waters" on the College Arms Property, the Court cannot grant summary judgment on that issue. Rather, disputed issues of material fact regarding the geographic features of Bum Hollow remain, particularly with respect to the physical characteristics of Bum Hollow Run and the Lower Drainage Swale. Those issues must be resolved at trial.

### 3.  Discharge of a Pollutant

The CWA defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A). Although proof that a pollutant is being released into or is present in navigable waters is extremely persuasive evidence of a "discharge of a pollutant," *see, e.g.*, *United States v. W. Indies Transport, Inc.*, 127 F.3d 299, 307-08 (3d Cir. 1997), a plaintiff may survive summary judgment even without such proof.

Indeed, there is substantial case law establishing that proof of a *release* of a pollutant that reaches a conveyance, combined with proof that the conveyance leads to navigable waters, may be sufficient to prove a "discharge of a pollutant" under the CWA. *See, e.g.*, *Rapanos*, 547 U.S. at 743 (noting that "lower courts have held that the discharge into intermittent channels of any pollutant *that naturally washes downstream* likely violates" the CWA (emphasis in original)); *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1149-50 (10th Cir. 2005) (holding that the presence of pollutants in water samples from either end of a 2.5 mile pipe could support the finding of a discharge of a pollutant). For example, in *United States v. Velsicol Chemical Corp.*, 438 F. Supp. 945 (W.D. Tenn. 1976), which was cited favorably in *Rapanos*, *see* 547 U.S. at 743, the defendant released pollutants into a city sewer system that emptied into the navigable waters of the Mississippi River. The district court found that the release constituted a "discharge of a pollutant" because the defendant "[knew] or should have known that the city sewers lead directly into the Mississippi River." *Id.* at 947. Even though the prosecution presented no evidence of the pollutant actually reaching the Mississippi River, the district court found the record sufficient to support a conviction for violations of the CWA.

Similarly, in *Reynolds v. Rick's Mushroom Service, Inc.*, 246 F. Supp. 2d 449 (E.D. Pa. 2003), a business that stored and processed waste generated by the mushroom industry constructed an impoundment to hold wastewater and channels to divert the flow of excess wastewater from the impoundment. The plaintiffs, neighboring property owners, alleged that wastewater escaping from the impoundment and the channels constituted discharges of a pollutant in violation of the CWA. To prove a "discharge of a pollutant," the plaintiffs sampled fluids from the channels just above their confluence with navigable waters, and tests performed on those samples revealed the presence of pollutants. The Court concluded that such evidence of

78

pollution in the channels was sufficient to demonstrate the discharge of a pollutant into navigable waters, even though there was no direct evidence of increased pollution levels in the navigable waters themselves. *Id.* at 454 ("[W]hether a point source discharge creates a net increase in the level of pollution is irrelevant to the liability issue in this case.").

The Court finds that there is sufficient evidence in the record to create a dispute as to whether Ursinus has discharged a pollutant into the Lower Drainage Swale and/or Bum Hollow Run. Although the dearth of testing performed on Bum Hollow Run is somewhat baffling, *but see supra* note 11, Tri-Realty has presented evidence from which a reasonable finder of fact might conclude that pollutants attributable to Ursinus have reached specific conveyances that likely carry those pollutants to navigable waters. Just like the plaintiffs in *Reynolds*, Tri-Realty has presented evidence that pollutants are present in a basin (i.e., the Impoundment) whose excess fluid allegedly empties into the waters of the United States by way of a channel (i.e., the Spillway), and that pollutants are present in the channel as well. Just as the Court found that the facts in *Reynolds* supported finding liability, so too might a reasonable fact finder conclude that Ursinus is liable under the CWA.

Moreover, Tri-Realty has arguably made a stronger showing than the plaintiffs in *Reynolds* because it has presented evidence of increased chrysene levels at the Confluence and Tri-Realty's expert attributed those chrysene levels to the No. 6 oil from Ursinus's USTs. Consequently, there is evidence from which a factfinder may infer that pollutants have actually been added to Bum Hollow Run. Although it is undisputed that there are numerous potential sources of chrysene, the elevated levels of chrysene at the Confluence, along with expert testimony identifying No. 6 oil as the source of that chrysene, create at least a dispute as to whether No. 6 oil released from the Ursinus USTs has actually reached navigable waters.

Ursinus even admits that there is a "dispute about whether regulated waters are actually contaminated by oily material attributable to Ursinus." (Def.'s CWA Reply Br. 11). And disputes regarding the source of a particular pollutant, traces of which were found in allegedly navigable waters, are sufficient to survive summary judgment. *See, e.g.*, *Gache v. Town of Harrison, New York*, 813 F. Supp. 1037, 1043 (S.D.N.Y. 1993).

Ursinus, relying almost exclusively on *George v. Reisdorf Bros., Inc.*, 696 F. Supp. 2d 333 (W.D.N.Y. 2010), argues that Tri-Realty has presented no evidence of a "discharge of a pollutant." In *George*, the owners of a dairy farm sued the owners of a neighboring property, alleging that the neighbors discharged various pollutants into Tonawanda Creek, a water of the United States that runs through the dairy farm. *Id.* at 335-36. The district court granted summary judgment in favor of the defendants because (1) based on tests of nonjurisdictional waters, the plaintiffs' expert opined only that pollutants *may* enter groundwater and flow into Tonawanda Creek, and such speculation did not create a triable issue of fact; (2) the presence in defendant's mill yard of a hose discharging water from defendant's grease pit and of a drain grate that runs into Tonawanda Creek did not establish that defendant had discharged a pollutant into Tonawanda Creek; and (3) speculative testimony about the source of a sheen on the surface of Tonawanda Creek did not create a triable issue of fact as to whether defendant had discharged a pollutant in violation of the CWA. *Id.* at 338-42. Ursinus argues that Tri-Realty's CWA claim suffers from the same deficiencies because (1) Tri-Realty presents only speculative evidence about the cause of sheens, iron staining, and biomasses allegedly observed in navigable waters, and (2) three isolated detections of chrysene in 2010 and 2011, and four tests of the Spillway in 2013, are not sufficient proof of oil contamination in any navigable waters, especially because tests from 2013 found no trace of chrysene at the Confluence or in Bum Hollow Run.

But the evidence in the record before the Court is distinguishable from the evidence in the record before the court in *George*. First, whereas the expert in *George* speculated that pollutants *may* enter navigable waters, Mr. Duchaine opined that No. 6 oil attributable to the Ursinus spill *will continue to* discharge into the Lower Drainage Swale and Bum Hollow Run Bum Hollow Run. (*See* Def.'s RCRA Ex.60 at 7-10). Second, although the *George* court did not explain its reason for finding that the presence of a hose and a drain gate were insufficient to establish the discharge of a pollutant into navigable waters, *see id.* at 340, the alleged pathway for pollutants to reach navigable waters in this case is much more direct and, in some ways, more predictable: pollutants have been detected in the Impoundment and the Spillway, and fluids escaping from the Impoundment and the Spillway can be expected to reach the Lower Drainage Swale and Bum Hollow Run. In light of the case law discussed above, *see supra*, the reasoning from *George* is inapposite. Third, even if there is no non-speculative evidence about the cause of sheens, iron staining, and biomasses allegedly observed in Bum Hollow, there is sufficient record evidence to potentially support CWA liability. For example, there is evidence suggesting that Ursinus's oil was detected in numerous monitoring wells on the College Arms Property, was detected in the Spillway, and will continue to discharge into the Lower Drainage Swale and Bum Hollow Run.

Drawing all reasonable inferences in favor of Tri-Realty, as the Court is required to do at this stage of the litigation, whether or not Ursinus discharged a pollutant into navigable waters is a genuinely disputed issue of material fact. A reasonable factfinder might conclude from the record evidence that Ursinus discharged a pollutant into the Lower Drainage Swale and/or Bum Hollow Run in violation of the CWA, so the issue must be resolved at trial.

At the same time, the Court will grant summary judgment in favor of Ursinus with respect to the alleged wetlands because the undisputed evidence in the record shows that there has been no discharge of a pollutant from a point source into the alleged wetlands. It is well established that the spread of pollution within a single body of water does not constitute the "discharge of a pollutant" under the CWA. In *Los Angeles County Flood Control District v. NRDC*, 133 S. Ct. 710 (2013), the Supreme Court decided that the flow of water out of a concrete channel within a river was *not* a "discharge of a pollutant" under the CWA because "pumping polluted water from one part of a water body into another part of the same body is not a discharge of pollutants under the CWA." 133 S. Ct. at 711 (citing *South Fla. Water Mgmt. Dist. v. Miccosukee Tribe*, 541 U.S. 95, 109-112 (2004)). This is because "no pollutants are 'added' to a water body when water is merely transferred between different portions of that water body." *Id.* at 713. In other words, "the transfer of polluted water between 'two parts of the same water body' does not constitute a discharge of pollutants under the CWA." *Id.* at 713 (quoting *Miccosukee Tribe*, 541 U.S. at 109-112).

The essence of Tri-Realty's CWA claim with respect to the alleged wetlands is that pollutants *from the alleged wetlands* are being discharged back into the alleged wetlands via the Impoundment. As the Court previously explained, the discharge of a pollutant to navigable waters is actionable under the CWA only if it comes from a point source. *See supra* Part III.C.1. Because diffuse groundwater migration is not point source pollution, the Impoundment is the only alleged point source from which pollutants are alleged to be discharging into the alleged wetlands. (*See* Pl.'s CWA Br. app. A). There are only two pathways through which pollutants from the Impoundment could arguably "discharge" into the alleged wetlands: (a) by traveling over the edge of the Impoundment and landing in the alleged wetlands, or (b) by penetrating

through the Impoundment wall and reaching the alleged wetlands.[44] However, pursuant to the

Supreme Court's reasoning in *Los Angeles County*, discharges into the alleged wetlands through

these pathways are not actionable under the CWA because these pathways are contained entirely

within the alleged wetlands. Because the Impoundment is located within the alleged wetland, any

oil that escapes the Impoundment first reaches the alleged wetlands via groundwater (i.e., via

nonpoint source pollution) and eventually returns to the same alleged wetlands after passing

through the Impoundment. One could argue that Ursinus's temporary detention of oil in the

Impoundment results in the discharge of a pollutant any time oil escapes from the Impoundment

into the alleged wetlands, but the Court finds that, under the circumstances present in this case,

the temporary detention of oil in one part of the alleged wetlands is not enough to result in

liability under the CWA. "As the Second Circuit put it . . . , '[i]f one takes a ladle of soup from a

pot, lifts it above the pot, and pours it back into the pot, one has not "added" soup or anything

else to the pot.'" *Miccosukee Tribe*, 541 U.S. at 110 (quoting *Catskill Mountains Chapter of*

*Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481, 492 (2d Cir. 2001)).[45] The result might

---

[44] Tri-Realty could argue that the creation of the Impoundment in the alleged wetland means that the entrance of oil into the Impoundment is itself the "discharge of a pollutant" because the Impoundment is located in the alleged wetland. However, oil reaches the Impoundment via groundwater, which the Court has already held is not a point source. Moreover, Tri-Realty's expert considers the Impoundment to be a surface water feature and *not* part of the wetlands. (Pl.'s Ex. 22 at 2; Pl.'s Ex. 11 at 62:3-15). Therefore, only oil escaping from the Impoundment (an alleged point source, *see supra* Part III.C.1.a), could possibly be a discharge of a pollutant.

[45] The following example helps illustrate the limited scope of CWA liability: Consider, for example, a Good (but naïve) Samaritan who takes it upon herself to clean a polluted waterway. She goes to the river with a clear jar, fills it with river water, scoops out the visible pollutants, and then returns the remainder of the jar into the river. The fact that some pollutants remain dissolved in the water that is returned to the river will not subject the Good Samaritan to CWA liability if she lacks a permit to discharge pollutants. In this case, Ursinus constructed the Impoundment in the alleged wetlands in order to capture and remediate oil that is already present in that alleged navigable waters. Therefore, even if the alleged wetland qualifies as navigable waters, there is no evidence of the *addition of a pollutant from a point source* into the alleged wetland and summary judgment for Ursinus as to the alleged wetlands is appropriate.

be different if oil removed from the alleged wetlands were reintroduced after the alleged

wetlands had been substantially remediated, or if a substantial amount of time had passed

between the removal of the oil and its reintroduction to the alleged wetlands. But the CWA will

not hold liable a party that, in the course of remediating a polluted body of water, does not ensure

that not a single drop of pollutant makes its way back into that same polluted body of water.

    **IV.**    **CONCLUSION**

       The Court will grant in part and deny in part each of Ursinus's Motions for Summary

Judgment. Subject to the limitations discussed above, the Court will grant summary judgment as

to the RCRA claim, except with respect to four theories of liability: (1) that humans and animals

may face an imminent and substantial endangerment as a result of intermittent exposure to

contamination at College Arms; (2) that animals may face an imminent and substantial

endangerment as a result of prolonged exposure to contamination at College Arms; (3) that

humans may face an imminent and substantial endangerment as a result of the spread of

contamination to locations at College Arms that might result in prolonged human exposure to

contamination; and (4) that the environment "in and of itself" may be endangered. Additionally,

and also subject to the limitations discussed above, the Court will grant summary judgment as to

the CWA claim with respect to any theory of liability based on alleged discharges of pollution

into the alleged wetlands, but deny summary judgment with respect to any theory of liability

based on alleged discharges of pollution into the Lower Drainage Swale and/or Bum Hollow

Run.

                                                                BY THE COURT:


                                                                S/Gene E.K. Pratter
                                                                GENE E.K. PRATTER
                                                                UNITED STATES DISTRICT JUDGE